THOMAS E. AND JUDITH C. CHARLTON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Charlton v. Commissioner
Docket Nos. 46689-86, 19295-87, 19297-87, 21098-87
United States Tax Court
T.C. Memo 1990-402; 1990 Tax Ct. Memo LEXIS 419; 60 T.C.M. (CCH) 324; T.C.M. (RIA) 90402; July 31, 1990, Filed Decisions will be entered under Rule 155. Larry Kars, for the petitioners. Doreen M. Suziand Robert Cuatto, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Pate pursuant to the provisions of section 7443A(b) and Rules 180 and 181. [2] The Court agrees with and adopts her opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: This proceeding concerns respondent's determination of deficiencies in tax and additions to tax for petitioners Thomas E. and Judith C. Charlton (hereinafter Charlton or the Charltons) as set forth in the notice of deficiency, and adjustments of partnership items for three partnerships as set forth in the notices of Final Partnership Administrative Adjustment (hereinafter FPAA). These partnership petitioners are: Diabetics CME Group, Ltd., Jules H. Klar, Tax Matters Partner (hereinafter DIABETICS); Allergy CME Group, Ltd., Jules H. *420 Klar, Tax Matters Partner (hereinafter ALLERGY); and Femcare CME Group, Ltd., Virgil Williams, Tax Matters Partner (hereinafter FEMCARE). [3]
In a notice of deficiency dated October 2, 1986, respondent determined the following deficiencies in tax and additions to tax with regard to the Charltons: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) *
Sec. 6659
1979
$ 2,402 $ 120.10   0         1981
16,858  842.90 **  $ 4,981.50
1982
6,086   304.30 **  1,825.80  Respondent also determined that the Charltons are liable for increased interest under section 6621(c) (formerly designated section *421 6621(d)), for each year at issue. In an amended answer, respondent alleged further that in the event that we do not sustain the addition to tax pursuant to section 6659 for 1982, then the addition to tax pursuant to section 6661 is applicable for 1982 in the amount of $ 1,521.50. However, respondent has since abandoned his claim that the Charltons are liable for the addition to tax under section 6659. In three FPAA's, respondent made the following adjustments (rounded to the nearest dollar): DIABETICS
1983
1984
Partnership loss
$ 1,777,655 $ 681,317   Short term capital loss
36,039 1,746 Long term capital loss
19,659 Interest capitalized
456,431 ALLERGY
1982
1983
Partnership loss
$ 320,000   $ 381,910   Qualified investment
credit property  (8,000,000)
(6,400,000)
FEMCARE
1983
1984
Other Income
$ (3,484)   $ (12,230)  Amortization
1,000 2,000 General partner fee
9,000 5,000 Miscellaneous
7 1,630 Leasing expense
212,522 261,550 Qualified investment
credit property  (7,021,304)
(7,021,304) In addition, respondent determined that the following additions to tax apply to deficiencies at the partner level for each partner in DIABETICS, ALLERGY and FEMCARE: Section 6653(a)(1) and 6653(a)(2) (negligence); section *422 6659 (valuation overstatement); and section 6661 (substantial understatement). Respondent also determined that each partner in DIABETICS, ALLERGY and FEMCARE was liable for increased interest under section 6621(c) (formerly designated section 6621(d)) for each year at issue. However, at trial and in his reply brief, respondent admitted that this Court lacks jurisdiction in these proceedings to consider the additions to tax at the partnership level. N.C.F. Energy Partners v. Commissioner, 89 T.C. 741 (1987); Maxwell v. Commissioner, 87 T.C. 783 (1986). Accordingly, the allegations as to these additions to tax will be dismissed for lack of jurisdiction. Therefore, with respect to the Charltons, the issues for our decision are: (1) whether petitioners are entitled to deduct losses they claimed in connection with their investment in DIABETICS in 1981 and 1982; (2) whether petitioners are entitled to the investment tax credit carryback they claimed in 1979; and (3) whether petitioners are liable for the addition to tax for negligence under section 6653(a) (for 1979) and under section 6653(a)(1) and (2) (for 1981 and 1982), the addition to tax for substantial understatement of tax under *423 section 6661 (for 1982), and additional interest under section 6621(c) (formerly section 6621(d)). The issues for our decision with regard to the partnerships are: (1) whether respondent correctly adjusted the income, expenses, and losses each partnership reported on its partnership returns; (2) with regard to ALLERGY and FEMCARE only, whether respondent correctly adjusted the amount of "Qualified Investment Tax Credit Property" ALLERGY claimed for 1982 and 1983, and FEMCARE claimed for 1983 and 1984. FINDINGS OF FACT Introduction
This case involves nearly 3,000 pages of transcripts, nearly 330 exhibits and more than 600 pages of briefs. Some of the facts have been stipulated and they are so found. We incorporate by this reference the stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts and the third supplemental stipulation of facts, along with the stipulated exhibits. This case is a test case for some 27 partnerships (hereinafter referred to collectively as CME) and numerous individual limited partners. Each of these partnerships invested directly or indirectly in the production, reproduction, marketing, and distribution of *424 medical educational video tapes (hereinafter tapes). The tapes were produced in a series of approximately 20 programs centered around one medical subject area. We will refer to these programs as the CME Video Tape programs, and to the series at issue as the DIABETIC series, the ALLERGY series, and the FEMCARE series. The purpose for the CME video tape programs was to provide continuing medical education, principally for the primary care physician. Primary care physicians include internists, general practitioners, and other physicians who are generally not board certified. The three partnership petitioners were formed to exploit the series in diabetes, allergies and gynecology. The fourth petitioner, Charlton, was a limited partner in DIABETICS. CAST OF CHARACTERS Hofstein
The leading man in this drama undoubtedly was Stephen A. Hofstein, Ph.D. (hereinafter Hofstein). Hofstein was the moving force behind the CME Video Tape programs. He coordinated the production and marketing of the CME video tape programs, and arranged for their exploitation through limited partnerships. He selected the general partners and essentially controlled all aspects of their involvement. Prior to his *425 involvement with CME, Hofstein was an inventor and the founder of Princeton Electronic Products, Inc., which manufactured electronic components (hereinafter Princeton Electronics). Concurrent with his involvement with CME, Hofstein was president of Tiffany Fine Arts, Inc., World Video Corporation, Videotech Associates, Inc., and Trans Oceanic Development Corp., and vice president of World Medical Marketing Corporation. Pietanza
Peter Pietanza (hereinafter Pietanza) had been Hofstein's business associate since 1974 or 1975 when he was vice president of operations at Princeton Electronics. Pietanza served as vice president of Tiffany Fine Arts, Inc., and World Video Corporation, president of CME Productions, Inc., and treasurer of World Video Licensing Corporation. Tiffany
Tiffany Fine Arts, Inc. (hereinafter Tiffany), was a Florida corporation which acted as a holding company for various subsidiaries. Hofstein's father held a 24-percent ownership interest in Tiffany for the benefit of Hofstein, Pietanza's father-in-law held a 26-percent ownership interest in Tiffany for the benefit of Pietanza, and Peter Rosenthal's (hereinafter Rosenthal) father held a 50-percent ownership in Tiffany *426 for the benefit of Rosenthal. Hofstein was president of Tiffany from 1979 through approximately 1984. Pietanza was vice president. Tiffany's address was 545 Madison Avenue, New York, New York. World Video
World Video Corporation (hereinafter World Video) was a wholly owned subsidiary of Tiffany. It produced the CME Video Tape programs. Hofstein served as World Video's president and sole member of its board of directors during all times relevant to this case. Pietanza served as its vice president and Rosenthal as an incorporating director. From 1981 through 1984, World Video also maintained its offices at 545 Madison Avenue, New York, New York. World Medical Marketing
World Medical Marketing Corporation (hereinafter World Medical Marketing) was another wholly owned subsidiary of Tiffany. Rosenthal served as president of World Medical Marketing and Hofstein served as its vice president from 1978 through 1979. As early as 1978, World Medical Marketing was licensing distributorships for the "Pedi-Pulsor," a device which offered a method of exercise for the bedridden patient. When Hofstein began to put the CME Video Tape programs together, he worked with many of the same people *427 he contacted while licensing distributorships for the "Pedi-Pulsor." Videotech
Videotech Associates, Inc. (hereinafter Videotech) was incorporated in May of 1980 in Florida. It was the successor in interest to World Video. Unlike World Video, however, Videotech was not a subsidiary of Tiffany. Rather, Hofstein held a minority interest in Videotech and Robert Macechak (hereinafter Macechak) owned the remainder of the stock. Hofstein served as president and Macechak as vice president, secretary, and treasurer. References to World Video and its activities in this opinion include references to Videotech, where appropriate. Sudler & Hennessey
Sudler & Hennessey was an advertising agency which specialized in health care communications. It was a division of Young & Rubicam, a broad-based advertising agency. It prepared a study identifying the universe of physicians to which sales of the CME Video Tape programs were targeted. McGraw-Hill
The Assets Management Services Unit of the Cost Information Systems Division of McGraw-Hill Information Systems Company (hereinafter McGraw-Hill) provided independent appraisal services. McGraw-Hill provided appraisal services to the partnerships at *428 the behest of World Video. Orlando Rodriguez (hereinafter Rodriguez) was employed by McGraw-Hill. He appraised each of the programs in the DIABETICS, ALLERGY and FEMCARE series. ACCME
In 1982, approximately one-half of the States in the United States required continuing medical education in conjunction with renewing licenses to practice medicine. The American Medical Association awarded continuing medical education credit to physicians based on a categorical credit system. On January 1, 1981, the Accreditation Council for Continuing Medical Education (hereinafter the ACCME) was formed to assume responsibility for the accreditation of medical institutions providing continuing medical education. [4] After accreditation, these medical institutions were authorized to award credits to individual physicians to meet their State's requirements. In 1981, there were approximately 117 medical schools and numerous learned societies which were authorized to grant "category I" credits. Of the various categories *429 of credits awarded, category I credits were the most desirable for physicians to acquire. Wilbur
Richard S. Wilbur, M.D. (hereinafter Wilbur) served as secretary to the ACCME. His responsibilities included encouraging the delivery of high-quality continuing medical education and ensuring that sponsors of continuing medical education met the standards, or "essentials," established by the ACCME. Hahnemann
The Hahnemann Medical College & Hospital of Philadelphia (hereinafter Hahnemann) is a private medical school in Philadelphia, Pennsylvania. In the mid 1970's, Hahnemann established a television studio to enhance delivery of educational programs. Prior to its work with World Video, Hahnemann produced nearly 100 video tapes entitled "The Chairman's Grand Rounds." The Grand Rounds were didactic presentations in which a physician presented data on a particular patient, after which observers asked questions and discussed treatment. Between 1981 and 1984, Hahnemann produced more than 400 programs for World Video, including those in the DIABETICS, ALLERGY and FEMCARE series. Schaefer
Robert Schaefer (hereinafter Schaefer) was Director of the School of Continuing Education, a division of *430 Hahnemann. The School of Continuing Education provided continuing medical education for physicians and allied health professionals. Schaefer was responsible for developing, implementing and administering these educational programs. Schaefer was the individual at Hahnemann who was primarily responsible for the production of the CME Video Tape programs at Hahnemann. He was also the individual at Hahnemann who reported to the ACCME for Hahnemann's accreditation and reaccreditation. World Video Licensing, CME Productions, and Trans Oceanic Development
These three corporations served as "middlemen" in the CME transactions. World Video Licensing Corporation (hereinafter Licensing) probably was incorporated in New York, originally under the name World Capital Corporation, but the record does not contain any documentary evidence supporting this. Pietanza served as its treasurer. CME Productions, Inc. (hereinafter CME Productions), was incorporated in New York in May of 1980. Pietanza served as its president. Trans Oceanic Development Corp. (hereinafter Trans Oceanic) was incorporated in Delaware in April 1981. Hofstein served as its president. He was also the sole shareholder through *431 December of 1983 when Karen Hofstein, his wife, became the sole shareholder. As of July 31, 1985, Trans Oceanic became a wholly owned subsidiary of Videotech. Medical Video Marketing
Medical Video Marketing, Inc. (hereinafter Marketing), reproduced, marketed, and distributed video tapes to physicians on behalf of DIABETICS, ALLERGY and FEMCARE. Macechak
Macechak was president and sole shareholder of Marketing. Macechak had worked with Hofstein and Pietanza at Medical Products Marketing, a company which distributed tapes for earlier CME partnerships. He was also the majority shareholder and an officer in Videotech. Klar
Jules H. Klar (hereinafter Klar) served as general partner and tax matters partner to DIABETICS and ALLERGY. In the 1960's, Klar created a company known as $ 5-A-Day Tours which was built around his idea of mass-marketing travel trips to Europe for Americans. He sold out of $ 5-A-Day Tours in 1969, moved to London and worked under contract for the company for 5 years after which he started an investment banking company in London. He returned to the United States in 1977, settled in Phoenix and began investing in real estate, and oil and gas ventures. He and his wife *432 owned and operated CME Tours, Inc. CME Tours
In 1983, Klar formed CME Tours, Inc. (hereinafter CME Tours). CME Tours marketed tours utilizing the CME Video Tape programs. Williams
Virgil Williams (hereinafter Williams) served as general partner and Tax Matters Partner to FEMCARE. Williams was a founder and president of a financial planning and consulting organization in Richmond, Virginia. He had been active in forming several real estate limited partnerships prior to his involvement with FEMCARE. Diabetics, Allergy and Femcare
The limited partnership agreement for DIABETICS was filed in Connecticut on December 10, 1981. DIABETICS' principal place of business was located in Phoenix, Arizona. The limited partnership agreement for ALLERGY was filed in Arizona on September 18, 1981. ALLERGY's principal place of business was located in Phoenix, Arizona. The limited partnership agreement for FEMCARE was filed in Connecticut on December 29, 1983. FEMCARE's principal place of business was located in Richmond, Virginia. Charltons
The Charltons are petitioners in this case. The Charltons are husband and wife and filed joint Federal income tax returns for 1979, 1981 and 1982. Mr. Charlton *433 was a limited partner in DIABETICS. The Charltons resided in Paradise Valley, Arizona, when they filed their petition. Savage
Michael A. Savage (hereinafter Savage) is an attorney and a partner in the law firm of Gersten, Savage & Kaplowitz (hereinafter Gersten & Savage). Savage and his firm prepared the private placement memoranda for DIABETICS, ALLERGY and FEMCARE. THE PLOT Introduction
One of Hofstein's goals as president of World Video was to explore and develop business opportunities for video programs. By 1980, he and Pietanza conceived of an idea to mass market continuing medical education tapes. They envisioned an entire "video university" from which physicians could purchase or rent video tapes on a number of medical areas and obtain category I credits. Consequently, World Video entered into an agreement with Hahnemann under which Hahnemann agreed to produce the programs, and to grant category I credits to physicians who purchased a tape and successfully passed an exam on its content. While the programs were being produced, Hofstein commissioned market studies which identified approximately 125,000 primary care physicians as the target audience for sale of the tapes. It *434 identified a secondary group of physicians and entities (hospitals, schools, etc.), which also might be interested in purchasing the tapes. Next, Hofstein obtained an appraisal which found, essentially, that the video tape university concept was unique, and if the tapes were marketed quickly and vigorously, they would enjoy rapid and widespread market acceptance. Using these findings, the appraiser estimated that each series would generate gross receipts in excess of $ 48,000,000 in 10 years. Using this revenue projection, he determined that each program was worth in excess of $ 800,000. After production and delivery of the programs to World Video, Hofstein caused World Video to sell each series to a captive middlemen corporation for $ 800,000 per program, or a total of $ 16,000,000 for a 20-program series. The purchase price was paid only with a promissory note, bearing interest, and maturing in approximately 30 years. Finally, Hofstein caused limited partnerships to be created to exploit the programs. He selected general partners for the partnerships. The middlemen corporations licensed or leased the series to the partnerships, which, in turn, contracted with a marketing company *435 to have tapes produced from each program and sold to physicians. Generally stated, in the initial years, the partnerships generated substantial amounts of cash from the sale of their limited partnership units, then paid these proceeds to the middlemen corporations as license and lease payments. In turn, the middlemen corporations passed the cash along to World Video under the terms of their purchase promissory note. Details of these plans, and how they relate to the three partnership petitioners, follow. ACT I AGREEMENT TO PRODUCE VIDEO TAPES AND TO SECURE "CATEGORY I" ACCREDITATION FOR THEM Act I - Scene One Agreement to produce video tapes
In the summer of 1980, Hofstein and Pietanza approached Schaefer, the director of the School of Continuing Education at Hahnemann and Dr. Wilbur Oaks, chairman of the department of medicine at Hahnemann, for assistance in producing the medical education programs. On September 24, 1981, World Video reached a final agreement with Hahnemann for the production of the CME Video Tape programs, [5] in which Hahnemann agreed to produce 10 series of 20 programs each during the first contract year. Each program would be approximately 45 minutes long and *436 contain information sufficient for the viewer to obtain continuing medical education credits. World Video had the right to approve the editors who, in turn, would select the program's content, assist Hahnemann in selecting authors, and review the development of the series. Each program would follow the format of a didactic presentation followed by a panel discussion. Under the agreement, Hahnemann was responsible for most aspects of production. These production responsibilities included developing goals, objectives, programs, and test materials for each series, assisting in selecting editors, moderators, and authors, and issuing invitations to professional participants. Hahnemann was also responsible for securing appropriate copyright and other releases from the participants, producing the programs at its studio, preparing and grading examinations required for CME credit, and issuing category I credits. The agreement did not contain any commitment to update any of the tapes. World Video agreed to remunerate program participants and reimburse them for travel expenditures. It also agreed to pay Hahnemann $ *437 1,600 per program to cover a moderator, guest panel member, and an original and one copy of the tape. Editor and author honorariums were not included in this amount. Also, World Video agreed to pay for certain other production costs. In addition, World Video agreed to pay Hahnemann $ 600 per program for the related "software" (goals, objectives, and test materials). Delivery of a series was considered complete when the tapes and all related paperwork were delivered to World Video. The agreement commenced on October 5, 1981, and terminated on June 30, 1982. Thereafter, it automatically renewed on a year-to-year basis. Hahnemann retained no interest in the programs. Moreover, it did not participate in the distribution or sale of the tapes, and did not receive royalties from their distribution. It was prohibited from producing any competitive programs for sale to general hospitals or private physicians during the term of the contract and for 5 years thereafter. In addition, World Video had the right to negotiate in good faith to purchase any competitive programs that Hahnemann might produce after the expiration of the 5-year period. Act I - Scene Two Accreditation of Hahnemann *438 At roughly this same time, Hahnemann's accreditation with the ACCME had to be renewed. Schaefer completed the ACCME questionnaire on August 15, 1981, and on October 6, 1981, the ACCME approved Hahnemann's reaccreditation for a 6-year term beginning in 1981. As an accredited institution, Hahnemann was authorized to issue "category I" credit. To do so, Hahnemann had to follow guidelines set down by the ACCME. ACT II PREPARING PRIVATE PLACEMENT MEMORANDA FOR THE PARTNERSHIPS Act II - Scene One General provisions of the memorandums
Gersten & Savage prepared private placement memorandums for all three partnership petitioners. Diabetics
The DIABETICS private placement memorandum (dated September 28, 1981, and amended on October 30, 1981) (hereinafter the DIABETICS memorandum or the memorandum) offered to sell 20 to 35 limited partnership interests (hereinafter units) for $ 42,000 each, payable $ 15,000 in cash upon subscription, $ 15,000 on March 1, 1982, and $ 12,000 on January 3, 1983. The deferred payments would be evidenced by full recourse promissory notes bearing interest at 9 percent per annum. In addition, each limited partner would assume a proportionate share of DIABETICS' *439 liability to Licensing for the license fee, as described below. According to the memorandum, DIABETICS would license a series of 20 tapes (17 were actually produced), approved for category I accreditation, entitled "The New Face of Diabetic Management." Under the license, DIABETICS had the right to reproduce and sell copies of the tapes. A minimum license fee of $ 6,000,000 was payable, $ 700,000 in cash and $ 5,300,000 by long-term promissory notes due in April 1991 or, depending on certain partnership elections, April 2001. Each limited partner would assume a proportionate share of the $ 5,300,000 liability, up to $ 151,429 per unit. Interest on these notes was non-recourse. In addition, DIABETICS would pay Licensing a percentage of proceeds realized from the sale of the tapes. A more detailed description of the terms of the license is included in Act II - Scene Four. If 35 units were sold, DIABETICS would raise $ 1,470,000 in cash. Of that, it would have $ 770,000 in offering proceeds remaining after paying the $ 700,000 minimum license fee. It planned to set aside "a significant portion of the proceeds of this Offering" in an investment account. According to the schedule showing *440 expected disbursements from the offering proceeds, $ 434,500 would be placed in the investment account. That amount, coupled with the projected earnings on this investment account, would be used to pay off the $ 5,300,000 notes in the event that sales projections were not realized. The $ 335,500 in cash remaining would cover expenses, general partner fees, and the like. DIABETICS agreed to pay the general partners a commission for placement of the units equal to 15 percent of the cash portion of each unit sold without the assistance of a third party ($ 220,500 for 35 units), a general partner fee in the amount of $ 7,500 in the years 1981 and 1982, and an annual management fee equal to 1 percent of the asset value of the investment account. DIABETICS also was to pay a fee for tax advice of $ 25,000, an appraisal fee of $ 15,000, and organization expenses of $ 15,000. The memorandum estimated that DIABETICS would be left with $ 45,000 of working capital out of the total of $ 1,470,000 it planned to raise. Other than certain schedules contained in the appraisal, which was attached to the memorandum, the memorandum did not include any forecast of income or expenses expected to be *441 realized from the exploitation of the tapes. The memorandum also did not contain any projection of when the limited partners were likely to receive cash distributions or whether (or when) those cash distributions would equal or exceed the limited partner's capital investment (despite the fact that the programs had limited useful lives and would be worthless thereafter). Rather, the market potential of the programs was described in very general terms (except for the sales forecasts contained in the appraisal). The memorandum also contained the usual disclaimers as to any representations or assurances of the marketability of the programs. With regard to tax benefits to be afforded the limited partners, however, the memorandum did contain a forecast showing actual amounts. It disclosed the following expected results (per $ 42,000 unit) assuming no sales revenue and assuming a 50-percent tax bracket taxpayer: 1981
1982
1983
Capital Contribution *
$ 15,000
$ 15,000
$ 12,000
Deductible Loss
58,021
64,662
70,658
Investment Ratio
3.9 to 1
4.3 to 1
5.9 to 1
DIABETICS' *442 profits and losses were to be allocated 1 percent to the general partner and 99 percent to the limited partners until the limited partners received distributions equal to their capital investment. Thereafter, the general partner's share rose to 3 percent. Charles Peters was initially named as the general partner. Allergy
The private placement memorandum for ALLERGY (hereinafter the ALLERGY memorandum) was completed in its final form on October 30, 1982. It was similar to the DIABETICS memorandum in all material respects except as indicated below. The ALLERGY memorandum offered to sell 20 to 35 limited partnership interests for $ 28,000 each, payable $ 14,000 upon subscription, and $ 14,000 on March 15, 1983. The deferred payments were evidenced by a full recourse promissory note carrying interest at 9 percent per annum. Unlike DIABETICS, ALLERGY did not sign any long-term promissory notes in connection with its lease of the Allergy series. Consequently, the ALLERGY memorandum did not contain any provisions for the assumption of ALLERGY's liabilities by the limited partners. In addition, ALLERGY did not provide for an investment account. ALLERGY intended to lease a series of video *443 discs, approved for category I accreditation, entitled "Allergic Disease in Primary Care Medicine," from CME Productions which had purchased them from World Video. (More detailed information regarding the lease agreement may be found in Act II - Scene Four.) Under the lease, ALLERGY had the right to reproduce the series and sell tapes. Additionally, ALLERGY was to receive an investment tax credit passthrough of $ 800,000 for 1982, and $ 640,000 for 1983 from CME Productions based upon qualified property in the amounts of $ 8,000,000 and $ 6,400,000, respectively. The ALLERGY memorandum discloses that First Affiliated Securities (hereinafter First Affiliated) was going to sell the limited partnership units. If all of the units were sold, ALLERGY would raise $ 980,000 in cash, which it would disburse as follows: Fee for tax advice
$ 25,000 Fee for appraisals
15,000
Organization costs
21,500
Marketing allowance
19,600
Selling commissions
98,000
Lessor rental payment
645,500
General Partners fee
75,000
After disbursing the fees and expenses listed above, ALLERGY would be left with $ 80,400 in working capital. As with DIABETICS, no financial projection of expected sales, profits, or cash distributions *444 was included in the ALLERGY memorandum (except for the schedules attached to the appraisal). With regard to expected tax benefits, however, the memorandum disclosed (assuming no sales revenue and a 50-percent tax bracket): 1982
1983
Capital Contribution
$ 14,000
$ 14,000
Deductible Loss Equivalent(1) $ 53,177
$ 46,544(2)
Investment Ratio
3.8 to 1
3.3 to 1
(1) Consists primarily of lease payments and investment tax credit. Each dollar of the investment tax credit is treated as $ 2.00 of deductible loss. (2) Assumes that the Partnership will claim 80 percent of the investment tax credit under the Tax Equity and Fiscal Responsibility Act of 1982. ALLERGY's profits and losses were to be allocated 1 percent to the general partners and 99 percent to the limited partners until the limited partners received distributions equal to their capital investment. Thereafter, the general partner's share would rise to 3 percent. However, positive cash flow would be allocated 15 percent to the general partners, 10 percent to the Dealer/Manager, and 75 percent to the limited partners, after payment of partnership obligations. [6] *445 Jules H. Klar and Oren Hutchinson were initially named as general partners. Femcare
The date of the private placement memorandum for FEMCARE (hereinafter the FEMCARE memorandum) is unknown because a complete copy was not submitted into evidence. However, except for the differences noted below, the remainder of the FEMCARE memorandum which was made available to the Court is similar to the ALLERGY memorandum in all material respects. The FEMCARE memorandum offered to sell 20 to 35 units for $ 19,600 each, payable $ 4,900 in cash upon subscription, $ 4,900 on October 1, 1983, and $ 9,800 on February 15, 1984. The deferred payments would be evidenced by full recourse promissory notes bearing interest at 9-percent per annum. FEMCARE intended to lease a series of video discs, approved for category I accreditation, entitled "Clinical Issues in the Female Patient" from Trans Oceanic which had purchased the discs from Videotech. Under the lease, FEMCARE had the right to reproduce the series and sell the tapes. (More detailed information regarding the lease agreement may be found in Act II *446 - Scene Four.) Additionally, FEMCARE was to receive an investment tax credit passthrough from Trans Oceanic of $ 702,130 for 1983 and the same amount for 1984, based on qualified property in the amount of approximately $ 7,021,300 for each year. Assuming all units were sold, the offering proceeds would total $ 686,000 and would be disbursed as follows: Fee for tax advice
$ 25,000 Fee for appraisals
12,000
Organization costs
12,000
Selling commissions
102,900
Lessor rental payment
474,100
General partners fee
20,000
After the above payments were made, FEMCARE would be left with $ 40,000 in working capital. In a separate document sent to representatives of potential limited partners, FEMCARE showed that for 1983, limited partners could expect a 3.7 to 1 writeoff and for 1984 they could expect a 3.8 to 1 writeoff, not taking into account any taxable income. These figures assumed that a limited partner would be in the 50-percent tax bracket. FEMCARE'S profit and losses were to be allocated 1 percent to the general partner and 99 percent to the limited partners until the limited partners received distributions equal to their capital investment. Thereafter, the general partners share would rise *447 to 3 percent. Virgil Williams was designated the general partner. Act II - Scene Two Sizing up the market
Diabetics
Attached to the DIABETICS memorandum was a series of agreements and other documents. Included among them was a report prepared by Sudler & Hennessey for World Video entitled "Target Audience Identification For World Video Corporation's Video Program Series On The New Face Of Diabetic Management." (We refer to Sudler & Hennessey reports as the Market Study or Study.) The Market Study is undated. The Market Study describes diabetes as a common medical problem which generates a large volume of visits to primary care physicians. It discusses the growing need of physicians for continuing medical education and represents that the DIABETICS series was designed to meet that need. It identified, as of August 1981, some 126,737 private practice, primary care physicians as the target audience for marketing the tapes. These physicians consisted of general practitioners, family practitioners, internists, and osteopaths. The Study contained a secondary listing of office-based physicians, totalling 48,800, who were considered potential purchasers of parts of the series. Finally, *448 the Study identified 7,000 hospitals employing 30,000 physicians and 65,000 residents, 123 medical schools/osteopathy schools, 490 medical libraries, 1,383 nursing programs, and in excess of 1,000,000 nurses, as additional potential users (tertiary sales targets). However, the Market Study makes clear that Sudler & Hennessey did not conduct its own independent market survey or analysis to assess the competitive environment, nor did it verify the technical and medical quality of the specific tapes, or the potential of the identified targets. The Study makes no judgment regarding the market viability of the tapes or the sales effort required for effective market penetration. Allergy
Sudler & Hennessey's Market Study for ALLERGY was entitled "Target Audience Identification for World Video Corporation's Video Program Series on Allergy." It also is undated. Essentially, it reiterates the information contained in the Market Study prepared for DIABETICS. Femcare
Sudler & Hennessey's Market Study program for the FEMCARE series was entitled "Target Audience Identification for Videotech Associates Video Programs Series on Clinical Issues in the Female Patient." It is undated. Essentially, *449 it reiterates the information contained in the Market Study prepared for DIABETICS. Act II - Scene ThreeAppraising video tapes
Diabetics
Also attached to the DIABETICS memorandum was an "Appraisal Of Master Value And Evaluation And Analysis Of License Fee Programs For World Video Corporation's Library On 'The New Face Of Diabetic Management' Prepared For DIABETIC CME ASSOCIATES" (hereinafter the Appraisal) dated September 24, 1981. The Appraisal was prepared by Rodriguez of McGraw-Hill. It set forth the assumptions upon which it is based, described in general terms the continuing medical education market (including the demand for continuing medical education by video tapes) and, finally, arrived at a value for each program in the DIABETICS series. The Appraisal also evaluated the license fee structure contemplated by the offering. The Appraisal was premised upon a number of assumptions including that: the physicians producing the series would be internationally recognized authorities, the programs would be of a high educational caliber, the information would be well presented, a professional sales approach would be taken in marketing the tapes, the tapes would be brought to market *450 in 1982, and that the tapes sold would contain an antipiracy feature to discourage unauthorized duplication. With respect to the specific educational needs physicians who treat diabetes have, the Appraisal quoted from a September 16, 1980, letter from Schaefer to World Video which states: Finally, many concepts concerning * * * diabetic complications [have] changed over the last decade * * *. These changes require major updating of previous information along with the addition of much new information. [sic] Therefore, an up-to-date videotape series covering the various aspects of diabetes mellitus will have a widespread appeal to the medical profession. The Appraisal found that continuing medical education was a billion dollar industry which had become important because of the prevalence of malpractice claims and the increasing requirements of medical societies and state authorities that physicians undertake such education. It found that education by video tape would enjoy market acceptance superior to other mediums. In choosing his valuation methodology, Rodriguez rejected the comparative sales method of valuation because: If it is to be meaningful as a value indicator, the comparative *451 sales method of appraisal must be premised upon data concerning sales of reasonably similar units, and that is clearly not possible in this instance. He also rejected a replacement cost methodology on the same grounds. Rather, Rodriguez chose to value the programs based on his estimate of their earnings potential. Essentially, he determined their value by taking the net present value of the expected net cash flows, including anticipated tax benefits, to be generated from sales of the tapes. To do this, he needed to determine an appropriate target market, sales price, useful life, discount rate, and expenses. Rodriguez relied on Sudler & Hennessey's findings to define the target market. Given the increasing demand for continuing medical education and the amount of money which was being spent thereon, he found that the DIABETICS series would enjoy rapid and widespread market acceptance. Moreover, he stated that, while there were approximately 200 organizations in the field of continuing medical education, none of them provided the quality of educational material contemplated in the DIABETICS series. Based on the foregoing, he estimated that from 1982 to 1991, DIABETICS would sell *452 11,303 sets of the DIABETICS series (of 20 tapes), or 226,060 individual tapes. With regard to the sales price, Rodriguez cited two issues of a video magazine, one dated June 11, 1979, which contained an article stating that sales of one company's video tapes were an increasing portion of their business with a selling price of $ 250 per tape, and a later issue (also dated in June 1979) which contained an article showing tape prices ranging from $ 130 to $ 400, and rental prices ranging from $ 36 to $ 72. He noted that the average direct cost of attending continuing medical education programs which, excluding lost profits, ranged from $ 7.69 to $ 50.00 per hour. Based on this information, he found that a sales price of $ 250 for each tape ($ 125 per each category I credit) was feasible, reasoning that this price was comparable to the cost of other forms of continuing medical education when taking into account inflation, fewer lost profits, and reduced travel time and expense. With regard to useful life, Rodriguez states that: the material * * * is fundamental and covers the broad spectrum of the specialty involved in a thorough 'encyclopedic' or reference fashion. The value of such *453 a reference work lies primarily in its long-term use to review and maintain the physicians capabilities and competence. He also quoted a letter from Schaefer to World Video dated September 12, 1980, which states in pertinent part: In conclusion, it can be expected that the Medical Video Program Library we are producing with you should be a major contribution to physician continuing study and will be of active interest to the medical profession for the coming decade and even beyond. Based on these views, Rodriguez assumed that the tapes could be sold over a 10-year period. After discussing the relevance of a discount rate in making present value determinations, and the "Capital Asset Pricing Model" as an appropriate method to use in determining a discount factor, Rodriguez chose (without explanation) a 25-percent discount rate formulated on pre-tax considerations. By taking into account an assumed effective tax rate of 35 percent, he then found that the appropriate after-tax discount rate was 16 percent. With regard to expenses, Rodriguez assumed that DIABETICS would be purchasing each program for $ 860,585 payable, 10 percent in cash, and 90 percent by purchase money promissory notes *454 bearing 9-percent interest. These notes were to be amortized (paid off) from 35 percent of net sales. He also estimated the cost to reproduce each tape, that sales and administration expenses would comprise 15 percent of sales, that overhead would be 1 percent of sales, and that other expenses would be 5 percent of sales. He also assumed that DIABETICS would depreciate the programs as "ACRS 5-Year Property", and would receive a 10-percent investment tax credit "(limited by 'at risk')" thereon. Finally, he assumed a tax rate of 35 percent. Using these assumptions, Rodriguez computed the value of each individual program. Starting with the premise that 11,303 tapes would be sold over a 10-year period at $ 250 per tape (or $ 4,250 per 17-tape series), he calculated gross cash receipts of $ 2,825,750 per tape (or $ 48,037,750 per 17-tape series). After deducting cost of goods sold and expenses (including interest and depreciation), he arrived at pre-tax income of $ 680,671 per tape (or $ 11,571,407 per 17-tape series). However, after adding back interest and depreciation, deducting taxes, and adding back the investment tax credit, he arrived at an estimated total cash flow of $ 1,741,086 *455 per tape (or $ 29,578,462 per 17-tape series). By applying the 16-percent discount factor to the cash flow amounts, he computed the present value of the cash flow to be $ 860,585 per tape (or $ 14,629,945 per 17-tape series). He found "good reason to believe" that the program should have uniform sales appeal. Accordingly, Rodriguez valued each tape in the DIABETICS series at $ 860,585 (or $ 14,629,945 for the 17-tape series). Rodriguez also evaluated the licensing agreement between DIABETICS and Licensing. In doing so, he assumed that the initial license fee would be $ 150,000 per tape, payable $ 26,250 in cash, and $ 123,750 by a promissory note, plus an override of 10 percent of net sales. The second period license fee was to be identical. The third period license fee would be $ 150,000, payable by a promissory note, plus an override of 10 percent of net sales. Further, he assumed that the notes would be amortized at a rate of 20 percent of sales and that the license fee for the fourth and remaining license period of 40 percent of net sales. With the above structure, Rodriguez concluded that the licensing agreement was "fair" and provided DIABETICS with an ample (50-percent) *456 return on its initial cash investment (equity). In reaching this conclusion, he set forth numbers for revenues, sales, and administrative expenses, overhead, and other expenses identical to those he used in determining the value of each program. However, because DIABETICS would be licensing rather than purchasing the tapes, no depreciation was taken into account. Also, interest expense was reduced considerably because it was based on the smaller debt employed to license the tapes rather than on the larger debt needed to finance the purchase of the series. Allergy
The Appraisal Rodriguez prepared for the ALLERGY series was dated October 5, 1982. Using essentially the same figures and rationale he used to value the DIABETICS series, Rodriguez computed the value of each individual program. Starting with the premise that 12,685 tapes would be sold over a 10-year period at $ 250 per tape (or $ 5,000 per 20-tape series), he calculated gross cash receipts of $ 3,171,250 per tape (or $ 63,425,000 per 20-tape series). After deducting cost of goods sold and expenses (including depreciation), he arrived at pre-tax income of $ 1,247,777 per tape (or $ 24,955,540 per 20-tape series). However, *457 after adding back depreciation, deducting taxes, and adding back the investment tax credit, he arrived at an estimated total cash flow of $ 1,776,028 per tape (or $ 35,520,560 per 20-tape series). By applying the 16-percent discount factor to the cash flow amounts, he computed the present value of the cash flow to be $ 877,663 per tape (or $ 17,553,260 per 20-tape series). Accordingly, Rodriguez valued each tape in the ALLERGY series at $ 877,663 (or $ 17,553,260 for the 20-tape series). He also found the lease to be "fair" and that it would return 50 percent on equity. Femcare
The Appraisal Rodriguez prepared for the FEMCARE series was dated December 22, 1982. Again, he used essentially the same figures and rationale he had used for the preceding appraisals, and computed the value of each individual program. Starting with the premise that 12,685 tapes would be sold over a 10-year period at $ 250 per tape (or $ 4,000 per 16-tape series), he calculated gross cash receipts of $ 3,171,250 per tape (or $ 50,740,000 per 16-tape series). After deducting cost of goods sold and expenses (including depreciation), he arrived at pre-tax income of $ 1,247,777 per tape (or $ 19,964,432 per *458 16-tape series). However, after adding back interest and depreciation, deducting taxes, and adding back the investment tax credit, he arrived at an estimated total cash flow of $ 1,776,028 per tape (or $ 28,416,448 per 16-tape series). By applying the 16-percent discount factor to the cash flow amounts, he computed the present value of the cash flow to be $ 877,663 per tape (or $ 14,042,608 per 16-tape series). Accordingly, Rodriguez valued each tape in the FEMCARE series at $ 877,663 (or $ 14,042,608 for the 16-tape series). He also found the lease "fair" and that it would return 50 percent on equity. Act II - Scene Four The license/lease agreements
Diabetics
Also attached to the DIABETICS memorandum was the License Agreement between World Video (later changed to Licensing) and DIABETICS which granted DIABETICS an exclusive worldwide right to reproduce, advertise, and distribute the DIABETICS series during the term of the License Agreement. The initial license period ran from the execution of the license to April 30, 1982. Thereafter, it was renewable for 9 additional 12-month periods beginning each May 1 and ending April 30, 1991. The license fee for the initial license period *459 was to be $ 100,000 per tape, payable: (1) $ 17,500 cash, and (2) by DIABETICS' recourse promissory note of $ 82,500, payable April 30, 1991, or, if extended, April 2001. The note bore non-recourse interest at a rate sufficient to avoid the imputation of interest (hereinafter long-term notes). The license fee for the second license period was identical to the first. The license fee for the third license period was $ 100,000 per tape, all payable by a long-term note. Thus, the fixed portion of the license fees for the DIABETICS series (of 17 programs actually produced) was $ 1,700,000 for each of the initial, second, and third license periods, for a total of $ 5,100,000. This amount was payable, $ 595,000 in cash, with $ 4,505,000 by long-term notes. In addition to the fixed portion of the license fees, Licensing was to be paid 5 percent of DIABETICS' net sales for the first three license periods. There was no $ 100,000 minimum license fee for the remaining 7 license periods; rather, DIABETICS agreed to a fee of 35 percent of its net sales for the remaining license periods. In addition, the license required DIABETICS to pay Licensing 15 percent of its net sales during the first *460 three periods as a prepayment of the long-term notes. Therefore, during the first three periods, payments to Licensing would total 20 percent of net sales, 5 percent for license fees, and 15 percent as prepayments on the long term notes. During the third through the ninth renewal terms, DIABETICS was to pay the first 15 percent of net sales on the long-term notes, but such prepayments reduced the current license fees, dollar-for-dollar. The net effect of this provision was to reduce the license fee to 20 percent of net sales until the notes were fully paid. The license warranted that category I credits were being provided through the auspices of Hahnemann. It also represented that at least 60 percent of the tapes would be delivered by Hahnemann within 10 days of execution of the license. The balance was due by March 1, 1982. It granted the licensor the right to update the video tapes and to veto any promotional materials that DIABETICS wished to use. DIABETICS agreed to use its best efforts to market the DIABETICS series and to equip all reproduced tapes with an antipiracy device, unless it received written consent from Licensing to do otherwise. Also attached to the DIABETICS *461 memorandum was a security agreement by which DIABETICS secured its performance of the terms of the License Agreement. It granted a security interest in and a general lien upon the assets in the investment account, the License Agreement, any inventory of products DIABETICS produced, and any accounts receivable. Allergy
Also attached to the ALLERGY memorandum was a Lease Agreement between CME Productions and ALLERGY which granted ALLERGY an exclusive worldwide right to reproduce, advertise, and distribute the ALLERGY series during the term of the Lease Agreement. The initial lease period ran from the execution of the lease to March 31, 1982. Thereafter, the lease was renewable for additional 12-month periods beginning April 1 and ending March 31 of each year. The lease could be terminated by CME Productions upon certain specified defaults (i.e., nonpayment of rent, bankruptcy) by the lessee. The fixed rental was $ 280,000 for the initial lease period and $ 365,500 for the second period for a total of $ 645,500. In addition, the lease required rental of 10 percent of net sales for the first two periods and 35 percent of net sales for each period thereafter including nine months after *462 termination of the lease. ALLERGY's lease expressly made no representation as to the market potential for the tapes and expressly excluded "any warranties of merchantability or fitness" of the programs. Moreover, it restricted references to Hahnemann's promotional material to the following: This video program series was produced by World Video Corporation in cooperation with Hahnemann Medical College and Hospital and School of Continuing Education. AMA approved Category CME accreditation of two credit hours per program is being provided through the auspices of Hahnemann Medical College's School of Continuing Education. Further, in the lease, CME Production agreed to make an election under section 48(d) of the Internal Revenue Code to permit ALLERGY to claim the investment tax credit. Femcare
Also attached to the FEMCARE memorandum was a Lease Agreement between Trans Oceanic and FEMCARE which granted FEMCARE an exclusive worldwide right to reproduce, advertise, and distribute the FEMCARE series during the term of the Lease Agreement. The initial lease period ran from the execution of the lease to March 31, 1984. Thereafter, it was renewable for additional 12-month periods beginning *463 April 1 and ending March 31 of each year, until 1993. The fixed rental was $ 212,550 for the initial lease period and $ 261,550 for the second period for a total of $ 474,100. In addition, the lease required the same percentage rental as the ALLERGY lease. It also contained the same provisions as the ALLERGY lease regarding the exclusion of warranties, the use of Hahnemann's name in promotional material, and the election as to the investment tax credit. Act II - Scene Five The limited partnership agreements
Also attached to each of the memorandums was a number of other documents. Basically, the limited partnership agreements authorized the sale of the limited partnership units described in the memorandums. The limited partners were required to certify that they had substantial income or capital from sources other than the CME Video Tape programs before they were allowed to purchase their unit(s). In addition, copies of the short-term promissory notes, security agreements, subscription agreements, and assumption agreements were included. Also attached to each memorandum was a lengthy opinion of tax counsel, a statement regarding tax assistance, an offeree questionnaire, and an offeree *464 representative questionnaire. ACT III THE SALE TO THE "MIDDLEMEN CORPORATIONS" AND THE MARKETING COMPANY Act III - Scene One The "middlemen corporations"
After World Video produced the CME Video Tape programs, it sold them to "middlemen" corporations which, in turn, licensed or leased the tapes and discs to the partnerships. Three middlemen corporations are involved in this case: Licensing, CME Productions, and Trans Oceanic. There is no purchase agreement between Licensing and World Video for the purchase of the DIABETICS series in the record. However, the first amendment to the DIABETICS memorandum, dated October 30, 1981, represented that World Video would be selling the DIABETICS series to Licensing. Sometime prior to December 31, 1981, World Video sold the 17 tapes comprising the DIABETICS series to Licensing for $ 800,000 per tape, a total of $ 13,600,000. There is little evidence in the record regarding the details of this sale. The purchase agreement between CME Productions and World Video for the purchase of the ALLERGY series calls for a purchase price of $ 16,000,000 for 20 discs. On November 15, 1982, CME Productions purchased the ALLERGY discs from World Video for "a *465 discounted volume price" of $ 800,000 per disc. In full payment therefor, it executed a promissory note to World Video in the amount of $ 16,000,000 due on December 31, 2015, together with annual interest of 9 percent. It also executed a security agreement granting World Video a security interest in the ALLERGY series and products derived from its exploitation. Ten of the tapes were to be delivered no later than December 31, 1982, the remainder on or before April 1, 1983. The purchase agreement between Trans Oceanic and Video Tech for the purchase of the FEMCARE series calls for a purchase price of $ 12,800,000 for 16 discs. On March 16, 1983, Trans Oceanic purchased the 16 discs comprising the FEMCARE series from Videotech for "a discounted volume price" of $ 800,000 per disc. In payment therefor, Trans Oceanic executed a promissory note to Videotech in the amount of $ 12,800,000 due on December 31, 2015, together with annual interest of 9 percent. It also executed a security agreement granting Videotech a security interest in the FEMCARE series. Hofstein executed documents for the sale of the discs both as president of Trans Oceanic and as president of Videotech. Eight of the *466 discs were to be delivered no later than December 31, 1983; the remaining eight discs were to be delivered on or before April 1, 1984. Act III - Scene Two The marketing company
Macechak became associated with Marketing in late 1982 or early 1983. Marketing was incorporated in April of 1983 to reproduce, advertise, and sell the CME Video Tape programs. Prior to its incorporation, it had been operating as an unincorporated entity. Once incorporated, Macechak served as president and owned 100 percent of its stock. Hofstein loaned approximately $ 250,000 to Marketing. Initially, it had a staff of two people, which later was expanded to four. Its offices were located near Hahnemann. Essentially, Marketing offered two distribution agreements to the partnerships, one as the exclusive distributor, and the other as a nonexclusive distributor. Under the exclusive distribution agreement, Marketing agreed to pay the partnerships 70 percent of net receipts (gross receipts less returns), less the cost of reproducing and shipping the tapes, accreditation and testing. Reproductions cost $ 30 each for Beta or VHS tapes and $ 40 each for 3/4-inch U-Matic tapes. Under the nonexclusive distribution *467 agreement, Marketing agreed to pay the partnerships 15 percent of net receipts, undiminished by any costs incurred by Marketing. Under both agreements, Marketing agreed to exert its best efforts and facilities to advertise and promote the tapes in some or all of the following media: newspapers, national and regional magazines, trade papers, direct mail, radio, television, or any other media that Marketing deemed appropriate. Marketing agreed, inter alia, to make available to the partnerships, upon request, copies of its advertising, to maintain accurate sales records, to work with Hahnemann to insure that only qualified purchasers or users received category I credit, and to be responsible for having sufficient copies reproduced and available of any tape ordered. Marketing installed an antipiracy feature on to some of the reproductions for a 3-month period beginning in the fall of 1982. After the machine that added this feature broke down, however, Marketing discontinued placing the device on any of the reproductions. On June 28, 1985, Macechak resigned his position with Marketing citing ongoing funding problems. THE PLAY ACT IV HOW THE PLOT PLAYED OUT Act IV - Scene One Production *468 of tapes
Hahnemann began producing the CME Video Tape programs and related software packages for World Video in the latter half of 1980. By February 1, 1984, Hahnemann had produced 17 programs for the DIABETICS series, 20 programs for the ALLERGY series, and 16 programs for the FEMCARE series. The programs were picked up by Hofstein, Macechak, or a messenger service directly from Hahnemann's television studio. Hahemann invoiced World Video approximately $ 1,000 per program for studio time and $ 600 per program for the related " software" packages, although it charged somewhat less for FEMCARE's "software" packages. Seven programs in the ALLERGY series were filmed at Media Concepts, and Hahnemann charged World Video less for those programs. In addition, World Video paid an honorarium of $ 1,000 per program to the physician who presented the lecture, $ 300 per program to the moderator, and $ 500 per program to Schaefer. Therefore, excluding incidental expenses, World Video expended approximately $ 3,400 per program in direct production costs. The record lacks sufficient evidence to determine the amount of overhead costs allocable to each of the programs. Act IV - Scene Two Diabetics' *469 operations
On September 16, 1981, Hahnemann agreed to produce the DIABETICS series. In December 1981, it delivered the first 12 tapes of this series to World Video. These tapes, which were used to make reproductions for sale, were 3/4-inch U-Matic tapes. On April 30, 1982, Hahnemann delivered the remaining 5 tapes to World Video. The software packages were delivered in installments between March of 1982 and March of 1983. In total, World Video paid Hahnemann $ 27,200, and Schaefer approximately $ 8,500, for the DIABETICS series. DIABETICS did not insure the series. In the meantime, a Certificate of Limited Partnership for DIABETICS was filed in Connecticut on December 10, 1981. It named Charles Peters as the general partner. On January 12, 1982, Klar was added as a general partner. Klar was the sole general partner of DIABETICS at the time of trial. The record does not contain any books or records of DIABETICS. However, we do know that offering proceeds of $ 457,500 were deposited from the first installment of the sale of 30.5 units into an escrow account prior to January 9, 1982. Other than these amounts, the record is devoid of evidence showing how much money was eventually *470 collected. We note, however, that 30.5 units would generate $ 1,281,000 at $ 42,000 per unit. DIABETICS did not generate any gross income from sale of the tapes during 1981 or 1982. DIABETICS executed the license and security agreement on December 31, 1981. There are no material differences between the license, as executed, and as attached to the Diabetes memorandum. In accordance with the license, DIABETICS paid a total of $ 297,500 ($ 17,500 times the 17 tapes actually produced) to Licensing from the escrow account ($ 105,000 in December of 1981 and the remainder in January of 1982) for the initial license period. In addition, DIABETICS executed a promissory note in favor of Licensing in the amount of $ 1,402,500 for the first license period, and another in the amount of $ 1,700,000 for the third license period. The record does not contain a promissory note for the second license period. Charlton executed an assumption agreement whereby he assumed his pro rata share of DIABETICS license fee to Licensing. DIABETICS paid the following amounts, in addition to the license fee, during January 1982 from its escrow account: $ 108,900 to DIABETICS, $ 12,000 to McGraw-Hill, $ 25,000 *471 to Gersten & Savage, and $ 14,100 to World Medical Marketing. In March of 1982, DIABETICS paid $ 25,000 to Licensing. In May of 1982, DIABETICS paid $ 276,962 to World Medical Licensing Corp. by check, which check was endorsed with the words "for deposit only pay to the order of World Video Licensing Corp. World MedicalLicensing Corp. World Video Corp." It was not until June 10, 1983, that DIABETICS entered into an exclusive distribution agreement with Marketing. The initial term was for one year, and it was renewable annually thereafter. In 1983, Marketing sold 10 tapes and rented 3 tapes in the DIABETICS series for total sales revenue of $ 589, of which Marketing paid $ 147 to DIABETICS. In 1984, Marketing generated sales of $ 3,443, of which Marketing paid $ 861 to DIABETICS. In 1985, Marketing sold 28 tapes for a total of $ 1,796, of which it paid no more than $ 450 to DIABETICS. Recapping, from 1983 to 1985, Marketing grossed $ 5,828 from the DIABETICS series and remitted $ 1,458 to DIABETICS. The sales price for tapes in the DIABETICS series ranged from $ 33.50 to $ 84. The record reveals little about the monies invested by DIABETICS in marketable securities, which were ultimately *472 to be used to pay off its long-term promissory notes. However, the investment account reflects balances as of December 31 of each year as follows: $ 59,125 for 1982, $ 193,809 for 1983, $ 204,543 for 1984, $ 229,156 for 1985, and $ 243,739 for 1986. Act IV - Scene Three Allergy's operations
On December 5, 1980, Hahnemann confirmed that it would produce the ALLERGY series. On or before December 24, 1980, it delivered the 7 tapes which had been produced at Media Concepts to World Video. In May of 1981, it delivered the remaining 13 tapes in the ALLERGY series. Hahnemann delivered the software packages to World Video in installments from July to December 1981. In total, World Video paid Hahnemann $ 49,867.89 for producing the ALLERGY series. In addition, it paid Schaefer approximately $ 10,000 for the ALLERGY series. ALLERGY did not insure the series. After delivery of the 3/4-inch U-Matic videotapes produced by Hahnemann, World Video hired Pioneer Corporation to produce a package of 25 video discs of each tape. World Video paid Pioneer Corporation approximately $ 3,275 per package of 25 discs, or approximately $ 65,500 for discs of the entire series. Pioneer Corporation shipped *473 the ALLERGY discs to World Video between January and June of 1983. Hofstein discarded all but one or two of the discs from each package. In the meantime, a Certificate of Limited Partnership for ALLERGY was filed in Arizona on September 18, 1981. Klar amended ALLERGY's Certificate of Limited Partnership on January 28, 1983, to reflect the final terms of the ALLERGY offering. As represented in the ALLERGY memorandum, First Affiliated was appointed exclusive sales agent of units in ALLERGY. In 1982, First Affiliated raised $ 490,000 through sales of 35 units. ALLERGY received another $ 490,000 during 1983 from its limited partners in payment of their second and final obligation under the subscription agreement. On December 27, 1982, ALLERGY leased the video discs in the ALLERGY series from CME Productions for 10 lease periods ending March 31, 1992. The parties amended the lease on December 30, 1982, to require lease payments in the amount of $ 280,000 and $ 365,500, respectively, for the first two lease periods. Because part of the lease payment was determined by a percentage of sales, the overall maximum fee depended upon the success of the series. The lease lists 21 titles (there *474 are two different number 9's). Four of the titles are repeated. To secure its obligations under the lease, ALLERGY executed a security agreement on December 27, 1982, granting CME Productions a security interest in and a general lien upon the lease, any inventory of products, and any accounts receivable. The jacket on the discs warned that they should be stored under "cool" conditions. Klar stored the discs in a rented storage facility in Phoenix, Arizona which was not air-conditioned. They were still stored at this facility at the time of trial. CME Productions elected to treat ALLERGY as having purchased the ALLERGY discs for purposes of the investment tax credit on a document dated December 30, 1982, and signed by Klar on April 15, 1983. This document states that possession of all 20 discs was transferred to ALLERGY on December 30, 1982. Seventeen titles are the same on the lease and the passthrough document. However, there are 20 titles on the passthrough document. Two of the topics are duplicated. The eighteenth was written in by hand on the passthrough document but does not appear on the lease. ALLERGY did not receive any income from sales in 1982. During December of *475 1982, ALLERGY paid $ 15,000 to McGraw-Hill, $ 25,000 to Gersten & Savage, $ 15,000 to World Video, $ 280,000 to CME Productions and $ 52,220 to First Affiliated. At the end of 1982, ALLERGY had approximately $ 102,900 in cash. On June 10, 1983, ALLERGY and Marketing executed an exclusive Distribution Agreement by which ALLERGY granted Marketing an exclusive right to promote and distribute the ALLERGY series throughout the United States. In 1983, Marketing sold or rented 13 ALLERGY tapes and made a bulk sale which Hofstein had arranged, for total sales revenue of $ 15,025, of which it paid $ 9,131 to ALLERGY. In 1983, ALLERGY paid $ 365,500 to CME Productions, $ 88,023.84 to Klar, $ 61,495.89 to First Affiliated, and $ 37,498.35 in miscellaneous expenditures. In 1984, Marketing sold or rented 15 video tapes for total sales of $ 576.95, of which $ 144 was paid to ALLERGY. In 1985, Marketing sold 5 video tapes for total sales of $ 167.50, of which $ 41.88 was paid to ALLERGY. Recapping the years 1983 through 1985, Marketing grossed $ 15,769.45 from the ALLERGY series, of which it paid $ 9,316.88 to ALLERGY. During this time period, Marketing's sales price per tape for the ALLERGY series *476 ranged from $ 33.50 to $ 84. Act IV - Scene Four Femcare's operations
On December 15, 1982, Schaefer confirmed that Hahnemann would produce the FEMCARE series. Hahnemann delivered the 16-tapes in the FEMCARE series to Videotech in seven installments. Two tapes were delivered on November 1, 1983, four on November 4, 1983, two on November 14, 1983, three on November 30, 1983, two on December 9, 1983, one on December 19, 1983, and two on January 31, 1984. Hahnemann delivered the software packages in three installments throughout April and May of 1984. In total, Videotech paid Hahnemann $ 20,338.76 for producing the FEMCARE series. Videotech also paid Schaefer approximately $ 8,000 for his role in producing the FEMCARE series. FEMCARE did not insure the series. After delivery of the 3/4-inch U-Matic tapes produced by Hahnemann, Videotech sent the tapes to the 3-M Company from which it produced a package of 25 hard video discs of each tape in the FEMCARE series. The discs were not indexed or segmented in any way. Therefore, the viewer could not automatically access a particular portion or subject matter on the disc. The 3-M Company shipped 9 packages of discs to Videotech in 1983 *477 and the remaining 7 packages in 1984. Videotech paid the 3-M Company approximately $ 2,700 per package of 25 discs, or approximately $ 43,200 for discs of the entire series. Hofstein discarded all but one or two of the discs of each program. In the meantime, Williams executed two Certificates of Limited Partnership for FEMCARE: the first on September 21, 1983, and the second on November 30, 1983, which was filed in Connecticut on December 29, 1983. Williams also signed an undated document entitled "General Partner Signature Page" which was attached to FEMCARE's unsigned and undated Limited Partnership Agreement. Williams and two or more certified public accountants whom he contacted sold units in FEMCARE. In 1983, $ 341,125 was raised through sales of approximately 35 units. In addition, FEMCARE received approximately $ 345,429.79 during 1983 from a combination of investment income and funds from its limited partners in payment of their second and final installment obligations under the subscription agreement. On June 16, 1983, FEMCARE leased 8 discs in the FEMCARE series from Trans Oceanic for 10 lease periods ending March 31, 1993. Williams did not execute the lease; an attorney *478 in Savage's firm signed on Williams' behalf. The Lease Agreement provides that FEMCARE pay a minimum of $ 97,100 for the first term beginning June 16, 1983, and ending March 31, 1984, and $ 144,100 for the second term beginning April 1, 1984, and ending March 31, 1985. Because part of the rental was based on a percentage of net sales, the overall maximum rental depended upon the success of the series. By amendments of July 28, 1983, and November 10, 1983, FEMCARE leased a total of 16 discs with minimum lease payments of $ 212,550 for the first term and $ 256,550 for the second term. On June 16, 1983, FEMCARE also executed a security agreement granting Trans Oceanic a security interest in the Lease Agreement, any inventory of products, and any accounts receivable. Williams signed, and thereby accepted, a document signed by Hofstein as president of Trans Oceanic notifying FEMCARE that Trans Oceanic elected, for purposes of the investment tax credit, to treat FEMCARE as having purchased the FEMCARE discs. The document is undated and states that possession of eight of the FEMCARE discs was transferred to FEMCARE on December 31, 1983. Williams signed a second, similar document involving *479 the remaining eight discs. It states possession of those discs was transferred to FEMCARE on April 1, 1984. During 1983, FEMCARE paid $ 12,000 to Trans Oceanic for the Appraisal, $ 25,000 to Gersten & Savage, $ 10,000 to Trans Oceanic for organization expenses, $ 212,521 to Trans Oceanic for the license fee, approximately $ 24,500 to Williams as general partner, $ 50,715 to Williams for sales of units, $ 1,000 to another salesman, and a $ 7 bank charge. At the end of 1983, FEMCARE had approximately $ 5,741 in working capital. In 1984, FEMCARE paid approximately $ 86,165 to Williams, $ 261,550 to Trans Oceanic, $ 784 to another salesperson, and $ 1,630.63 in operating expenses. FEMCARE did not receive any income from tape sales in 1983. Sometime after August 29, 1984, FEMCARE entered into a nonexclusive distribution agreement (dated July 22, 1984) with Marketing. This distribution agreement was essentially the same as that between Marketing and ALLERGY except that FEMCARE was to receive 15 percent of net receipts. In 1984, Marketing sold or rented 50 video tapes from the FEMCARE series for a total sales of $ 3,222.85 of which $ 812.44 was paid to FEMCARE. In 1985, Marketing sold *480 or rented 28 video tapes for total sales of $ 1,893.45, of which no more than $ 473.36 was paid to FEMCARE. Recapping 1984 and 1985, Marketing grossed $ 5,116.30 from the FEMCARE series and paid FEMCARE $ 1,285.80 therefrom. The sales price per tape for the FEMCARE series ranged from $ 33.50 to $ 105. Act IV - Scene Five
CME tours
In the early stages, Klar did not have a specific idea as to how his travel background could fit into his CME partnership involvement. He came up with the idea for CME Tours in mid-1982. He envisioned developing a business which would sell cruises and tours to physicians. During the tour, the CME library of tapes would be available for their viewing. The physician could choose the number of tapes that he wished to view, and could view them anytime during the time he was on the tour. Moreover, the physician then could take the examination, making him eligible to receive category I credit. Klar reasoned that these tours would "sell" because a physician could receive up to 20 hours of category I CME credits on one 7-day tour, and because the trip would (in CME's opinion) be tax deductible. In preparation for CME Tours, Klar contacted the American Medical *481 Association to learn the travel habits and patterns of physicians who attended seminars. In addition, he surveyed 100 physicians in Arizona to determine what their travel habits were. He also had many CME video tapes duplicated and placed in the CME Tours "library." He chose the 1/4-inch video tape format for this purpose. The cost of reproduction to 1/4-inch tapes was a joint effort by the partnerships and CME Tours. He then purchased 110 special cassette players and supplied them to various hotels, resorts, and cruise ships. The CME tapes and players were installed so as to permit 24-hour access. Color brochures were distributed to physicians in the United States and to more than 20,000 travel agents. Klar hoped that the travel agents would recommend his program to their physicians/clients. In addition, Klar hired a company by the name of Omnigistics in 1983 to promote a cruise project. Omnigistics assisted Klar in developing promotional material which was sent to physicians by direct mail. When responses to these direct mail campaigns were returned, Omnigistics assisted Klar in putting together a telemarketing team. CME Tours had two or three people who would telephone *482 physicians who responded to the promotional material to convert those sales leads into bookings. The registration fee for a 7-day program was $ 350, which included the right to view 10 tapes. CME Tours' expenses per tape were: a $ 12.50 fee to Hahnemann to grade the examination, either an $ 8 or $ 12 royalty to the partnership, and a $ 3.50 commission to the travel agent for total expenses of $ 24 or $ 28. This left CME Tours with a gross profit of $ 7 or $ 11 per tape. In addition, CME Tours received commission overrides from the hotels and cruise companies for the tour portion of the package. Wholesale travel agents normally receive a 5-percent override, but if enough volume is produced the override can go up dramatically. Klar was hoping to reach sufficient volume to generate a 40-percent override. Klar intended to penetrate the entire physician market. He envisioned CME Tours eventually doing tours for 200,000 physicians each year. He forecasted that 40,000 physicians would take CME Tour trips during the first year; however, only a couple of hundred doctors actually booked tour programs during 1983 and 1984. Klar invested approximately $ 250,000 and spent substantially all *483 of his time on CME Tours. He employed an assistant who had 4 years' experience in the travel industry. In addition, in 1982 and 1983, CME Tours and/or the partnerships paid Schaefer approximately $ 1,000 per month for consulting services. The partnerships did not receive any "up-front" payments for placing their tapes in the CME Tours library. However, CME Tours agreed to pay a royalty of $ 12 per tape to the partnerships for whom Klar was a general partner, and $ 8 to the partnerships for whom he was not a general partner. During 1984 and 1985, CME Tours paid $ 2,528 of royalties to the nine CME partnerships for which Klar was not a general partner and $ 3,900 to the six CME partnerships for which Klar was a general partner. DIABETICS received $ 864 and ALLERGY received $ 912 in royalties from CME Tours during 1984 and 1985. FEMCARE received no royalties from CME Tours from 1984 through 1987. Act IV - Scene Six
Charltons
The Charltons were limited partners in DIABETICS. They paid $ 28,873 for two-thirds of one unit in DIABETICS. Charlton relied on the advice and reputation of Klar in deciding to invest in DIABETICS. He had invested with Klar on a previous occasion and was satisfied *484 with his investment. He also consulted with his accountant, an attorney, and his personal physician regarding DIABETICS. Charlton also relied on the information contained in the DIABETICS memorandum in making his decision to purchase his interest. Although he knew that the Appraisal and Market Study were not prepared by independent parties but under the auspices of the promoters, he took the tax benefits into consideration when deciding to purchase his interest. Act IV - Scene Seven
The ACCME and category I withdrawal
In November of 1983, the ACCME contacted Schaefer regarding an advertisement which appeared in the November 1983 issue of "Medical Economics" journal. The advertisement was of Klar's CME tour operation, depicting the CME Video Tape programs and cruises as tax deductible and eligible for category I credit. By letter of February 14, 1984, Wilbur notified Schaefer of a complaint the ACCME received regarding Hahnemann's joint sponsorship of the programs. According to Wilbur, such sponsorship raised the "serious question" of whether Hahnemann had participated closely enough in planning and implementing the program and whether Hahnemann conducted an evaluation thereafter. *485 The ACCME required such participation when an accredited institution jointly sponsored continuing medical education programs with nonaccredited entities. Subsequently, Schaefer appeared before a panel of ACCME physicians to explain Hahnemann's participation, and the ACCME conducted an on-site survey at Hahnemann. By letter of October 5, 1984, the ACCME notified Hahnemann that it was to cease awarding category I credit for the CME Video Tape programs. Hahnemann did not appeal the ACCME's decision. Schaefer advised Hofstein and Macechak of the decision. By letter dated December 28, 1984, Hahnemann gave notice to World Video that it would be terminating its obligations under its contract with World Video. Hahnemann withdrew accreditation of the CME Video Tape program as of June 30, 1985. THE FINALE ACT V INCOME TAX REPORTING AND DISALLOWANCE Act V - Scene One
Diabetics - income tax returns
DIABETICS reported the following income and deductions on its Federal partnership returns for 1981 and 1982: 1981
1982 Income
-0-
-0-  Deductions
Licensing
$          $ 301,963 Miscellaneous
(15)
Casual labor
2,390 Bank charges
54 Commissions
131,094 Dues and subscriptions
435 Fees-general partner
15,000 Legal and professional fees
2,956 Postage
2,445 Telephone
486 Travel
6,734 Office expense
13,502 Marketing
10,000 Copies
142 Leased equipment
7,151 Audio
574 Amort. organization costs
6,720 Depreciation
1,551 Other Deductions
$ 1,725,000
Ordinary loss
$ 1,725,000
$ 503,182 For *486 1981, DIABETICS also reported net loss from self-employment of $ 17,250, and investment interest expense of $ 351. For 1982, DIABETICS reported a net loss from self-employment of $ 5,032, and investment interest expense of $ 126,225. Finally, for 1982, DIABETICS also reported net investment income of $ 18,211, and property eligible for investment credit of $ 10,341. DIABETICS reported the following income and deductions on its Federal partnership returns for 1983 and 1984: 1983 1984 Income
Gross receipts
$       535 $         Interest and dividends
16,645 20,389 Net income from royalties
2,004 Net loss from sale of boat
(4,995)
Other income
276 Total income
$    17,180 $  17,674 Deductions
Bad debts
63,896 Depreciation
2,068 Secretarial Services
1,219 Bank charges
213 Dues and subscriptions
152 Professional fees
13,403 32,924 Licenses
1,700,000 566,667 Postage and supplies
782 Telephone and utilities
9,959 Travel
2,221 513 Office expense
546 285 Marketing
7,509 Auto expense
6,452 Amortization
10,220 10,220 Office rental
9,625 Storage
333 Repairs and maintenance
443 1,086 Commissions
29,700 23,400 Total deductions
$ 1,794,845 $ 698,991 Ordinary loss
($ 1,777,665)
($ 681,317) For 1983, DIABETICS also reported a *487 net short-term capital loss from the sale of securities of $ 36,039. For 1984, DIABETICS reported, from the sale of securities, a net short-term capital loss of $ 1,746, and a long-term capital loss of $ 19,659. Finally, for 1984, DIABETICS also reported interest capitalized of $ 456,431, net loss from self-employment of $ 6,967, nonfarm income of $ 3, investment interest expense of $ 22,393, and two tax preference items: qualified investment income of $ 17,721, and qualified investment expenses of $ 692,001. Act V - Scene Two
Allergy - income tax returns
ALLERGY reported the following income and deductions on its Federal partnership returns for 1982 and 1983: 1982 1983 Income
Gross receipts
$   -0-   $  15,000 Interest and dividends
-0-   19,629 Tape rentals
156 Total income
$   -0-   $ 34,785 Deductions
Lease payments
$ 280,000 $ 365,500 Tax Advice
25,000 Appraisals
15,000 Telephone
1,334 Postage
1,380 Office expenses
290 Advertising
16,219 Travel
1,310 Accounting
1,229 Duplication fees
3,570 Marketing fees & commissions
5,563 Amort. organization costs
20,300 Total deductions
$ 320,000 $ 416,695 Ordinary loss
($ 320,000)
($ 381,910) For 1982, ALLERGY also reported qualified investment in new recovery *488 property of $ 8,000,000, and net loss from self-employment of $ 320,000. For 1983, it reported qualified investment in new recovery property of $ 6,400,000, net loss from self-employment of $ 4,015, net investment income of $ 19,629, and also showed the net investment income as a tax preference item. Act V - Scene Three
Femcare - income tax returns
FEMCARE reported the following income and deductions on its Federal partnership returns for 1983 and 1984: 1983 1984 Income
Gross receipts
Interest and dividends
$  12,230 Other income
$   3,484 -     Total income
$   3,484 $  12,230 Deductions
Guaranteed payments
$        $ 5,000 Fees to general partner
9,000 [7] 15,000 Amortization 1,000 2,000 Leasing expenses 212,521 261,550 Accounting & bank charges
7 1,631 Total deductions
$ 222,528 $ 270,181 Ordinary loss
($ 219,044)
($ 257,950) In addition, for 1983 FEMCARE reported qualified investment in new recovery property pursuant to section 48(a) of $ 5,617,043 (reflecting an unadjusted basis of $ 7,021,304). It reported the same amount for 1984. ACT V - Scene Four
Charlton - income tax returns
The Charltons deducted a $ 37,329 loss *489 from DIABETICS in 1981. The Charltons claimed a tentative regular investment credit of $ 2,402 for 1982, which they carried back to 1979 because they reported no taxable income for 1982. In 1982, the Charltons deducted a $ 40,845 loss from DIABETICS, for a total loss deduction of $ 78,174 for the 2-years. ACT V - Scene Five
Respondent's determinations - partnerships
In three FPAA's issued, two on March 30, 1987, and one on April 8, 1987, respondent disallowed all of the losses and investment credits reported on the aforementioned DIABETICS, ALLERGY and FEMCARE partnership returns. Respondent's adjustments have been detailed in the beginning of this opinion. In general, the adjustments were made by respondent on the grounds that the partnerships had not established that they had: (1) any economic substance or reasonable expectation of profit; (2) any purpose other than the avoidance of Federal income tax; (3) activities which constituted the carrying on of any trade or business within the meaning of section 162 or with respect to property held for the production of income within the meaning of section 212 of the Internal Revenue Code; (4) engaged in an activity for profit within *490 the meaning of section 183 of the Internal Revenue Code; or (5) deducted losses or claimed investment tax credits exceeding the amount partners were "at risk" as defined by section 465 of the Internal Revenue Code. Further, respondent disallowed the depreciation deduction because the partnerships had not established the year the depreciable assets were placed in service, or the useful life of said assets, or the proper basis of the assets. Further, respondent determined that the basis of the assets did not include the principal balance of the promissory notes because no bona fide indebtedness existed. Respondent also disallowed the investment interest expense deduction because it did not represent interest paid on a bona fide indebtedness. In addition, with regard to ALLERGY and FEMCARE, the investment credit was disallowed on the grounds that: (1) the tapes are not "qualified film"; (2) the tapes are intangible property; (3) the investment credit is limited to the amount the lessor is at risk; (4) the basis in which the credit is computed is limited to the fair market value of the tapes; or (5) the tapes were not placed in service during the taxable year. Act V - Scene Six
Respondent's *491 determinations - Charlton
In a notice of deficiency issued in October 1981, respondent disallowed, for 1981 and 1982, the Charltons' distributive share of DIABETICS' loss, and for 1979 the ITC carried back from 1982, and determined additions to tax for negligence (sec. 6653(a)), valuation overstatement (sec. 6659), and additional interest (sec. 6621(c)). Respondent's adjustments have been detailed in the beginning of this opinion. In general, respondent disallowed Charlton's distributive share of DIABETIC's loss, depreciation, and investment interest on the same grounds as stated on the FPAA issued to DIABETICS. THE EPILOGUE ACT VI THE EXPERTS Act VI - Scene One
Mosesson
Respondent's expert Gloria R. Mosesson (hereinafter Mosesson) was the only appraiser in this case who actually viewed all of the tapes at issue. She found that the tapes were "poorly done from a technical viewpoint." In addition, Mosesson found the marketing efforts were not begun in a timely manner for any of the partnerships. The DIABETICS tapes were produced in late 1981 and early 1982, yet the accompanying software was not completed until 1983 and the distribution agreement with Marketing was not signed until *492 June 10, 1983. Similarly, ALLERGY's tapes were produced in late 1980 and early 1981, but the discs were not leased to the partnership until December of 1982 and ALLERGY did not execute a distribution agreement with Marketing until June 10, 1983. FEMCARE did not execute its distribution agreement with Marketing until June 22, 1984, more than six months after the tapes were produced at Hahnemann. These delays harmed potential sales because the medical information contained on the tapes was becoming outdated. She concluded that the tapes had a value of zero, both at the time of licensing or leasing, and for all subsequent periods. Act VI - Scene Two
Krasney
Respondent's expert, Stuart Krasney (hereinafter Krasney), prepared a marketing forecast for the tapes, as the market existed between 1978 and 1983. He developed three different scenarios for each of the DIABETICS, ALLERGY and FEMCARE series: "Best Case Forecast," "Worst Case Forecast," and "Most Probable Case Forecast." In each, Krasney accepted and used Rodriguez' methodology. However, Krasney based each of his forecasts upon his own primary market research and his review of secondary market data. Under the Best Case Forecast, *493 Krasney assumed a higher than expected willingness by physicians to spend their own money on continuing medical education by video tape, an aggressive marketing effort, and the growth of a strong referral base of satisfied physicians who influenced the purchasing decision of their peers. He dropped the sales price in later years in order to reflect pressure from competition. Under these most favorable assumptions, Krasney found that a tape had marketable lifetime of 5-years. Assuming $ 250 as the selling price for the first year, and dropping that number by $ 50 each year (i.e., $ 200 for year 2, $ 150 for year 3, and so forth), he estimated that 100 tapes could be sold in year 1, 150 tapes in each of years 2 and 3, 100 tapes in year 4, and 50 tapes in year 5, for a total of 550 tapes. Using Rodriguez' financial model, under the best case forecast, Krasney found that the mean tape valuation, including tax benefits, was $ 35,780 for each tape in the ALLERGY and FEMCARE series. Without the value of anticipated tax benefits, he valued each tape at $ 29,343. With respect to DIABETICS, Krasney found that the two values were $ 37,868, and $ 29,993, respectively. Under the Worst Case *494 Forecast, Krasney assumed such conditions as major cuts in hospital spending on continuing education programs, due to the then forthcoming changes in the Medicare reimbursement payment schedule, a perceived lack of quality of the tapes, and higher than expected pressure from competition. He dropped the sales prices to reflect a lack of market acceptance. Under these assumptions, he found that a tape had marketable lifetime of 3 years and used $ 150 as the sales price for the first year, $ 100 in year 2, and $ 50 in year 3. Finally, under those assumed conditions, he estimated that only 100 tapes could be sold each year. Again, using Rodriguez' financial model, under his worst case forecast, he found a mean tape valuation of $ 9,901 for each of the tapes in the ALLERGY and FEMCARE series. Leaving the value of anticipated tax benefits out, he found a mean tape valuation of $ 8,900. With respect to DIABETICS, Krasney found that the two values were $ 10,200 and $ 9,136, respectively. Under the Most Probable Case Forecast, Krasney found a marketable lifetime of 4 years and used $ 200 as the sales price for the first year, $ 125 in year 2, and $ 75 in years 3 and 4. Finally, he forecasted *495 that 100 tapes could be sold in year 1, 150 in year 2, 100 in year 3, and 50 in year 4, for a total of 400 tapes. Using Rodriguez' financial model, he found a mean tape valuation of $ 18,511 for each of the tapes in the ALLERGY and FEMCARE series. Leaving the value of anticipated tax benefits out, he found a mean tape valuation of $ 15,800. With respect to DIABETICS, Krasney found that the two values were $ 19,158 and $ 16,180, respectively. Krasney did not view the series as "unique" in that, from a physician's point of reference, a "unique" product was one that was unavailable anywhere else. Around the time that the tapes at issue were being offered, the American Medical Association was marketing a CME video tape series entitled "the Video Clinic Series." Moreover, there were 440 national organizations accredited by the ACCME to issue category I credits and 1,800 community hospitals accredited by State medical societies which were also providing category I credits to physicians during this time period. Krasney believed that community hospitals provided the primary means by which physicians obtained category I credits at all times relevant to this case. Act VI - Scene Three
Parks *496 Respondent's third expert, Richard W. Parks (hereinafter Parks), prepared an "Economic Analysis Of The DIABETIC, ALLERGY, And FEMCARE CME Limited Partnerships And Their Underlying Transactions, Contracts, And Appraisals." In it he analyzed the reports prepared by respondent's other two experts. He also took into account the purchase agreements between World Video and the middlemen corporations, the private placement memorandums, the license and lease agreements, the market studies, the appraisals, the limited partnership agreements, the security agreements, the promissory notes, and the distribution agreements between the partnerships and Marketing. Parks reached several conclusions based upon his analysis. First, he concluded that the tapes were "grossly overvalued," both by the appraisal and the sales to the middlemen corporations. In support of this conclusion, he focused on the following factors: (1) reproduction costs and potential competition for the tapes; (2) World Video's poor experience in the marketplace with prior CME tapes; (3) the assumed lifetime of the tapes; and (4) the technical mistakes Rodriguez made in preparing the appraisals. With regard to the first factor, *497 Parks pointed to a fundamental economic principle found in competitive markets, viz, that the fair market value of goods which can be reproduced, tends toward the cost of reproducing equivalent or substitute goods. This principle is operative because competitors will enter into production of substitute goods (and offer them at a lower price) if the market value or price of the existing goods exceeds reproduction costs. This cycle would continue until market value and reproduction costs were at approximately the same level. The tapes at issue were produced at a cost of less than $ 10,000 each, but were valued and priced at approximately $ 800,000 each. Parks found that the tapes and discs were not "unique" because substitutes could have been produced by comparable professionals, at a similar cost, from more than one hundred medical centers throughout the United States, and brought to market with "very little" time delay. Therefore, it would have been both feasible and extremely profitable for competitors to enter the market. Accordingly, Parks found that "It *498 is extremely unlikely that the [tapes] had a value that is almost certainly over one hundred times their reproduction costs." With respect to the second factor, World Video's prior experience in the marketplace, Parks notes that when the ALLERGY and FEMCARE series were being appraised, information was available about the market performance of other CME tapes. Nevertheless, Parks found " no evidence of caution" in the optimistic projections of price and sales volume made by Rodriguez notwithstanding Rodriguez' own statement that "Previous partnership sales have not done as well as projected (e.g. Ultrasound) and in other cases have been negligible to date." With regard to the third factor, the assumed lifetime of the tapes, Parks found that the 10-year useful life "almost certainly overstates" their likely economic life when compared to sales patterns of other information and media products, taking into account the likelihood of competition entering the market and the relatively topical nature of the tapes. Finally, in Park's opinion, Rodriguez made many technical mistakes. He first criticized the optimistic level of cash flow used. He found that the net cash flow for each year for *499 the CME video tapes could reasonably be expected to take a number of values over some range, and that Rodriguez chose to discount cash flows based only on potential sales, not on expected sales. Additionally, Rodriguez chose his 16-percent discount rate arbitrarily and without foundation although he first presented "a confused discussion of risk and return and the Capital Asset Pricing Model (CAPM)." Parks characterized the sales of tapes from World Video to the middlemen corporations for $ 800,000 each as "shams." To support this conclusion, he calculated the present value of such an obligation due in 33.13 years, assuming a risk-free interest rate based on Treasury bonds to be approximately $ 100,000 per tape. When those obligations were further discounted to reflect the "significant risk of default," they would be worth even less. The second of Park's conclusions was that the transactional documents taken as a whole reveal that the marketing of the tapes was "incidental" to securing tax benefits. In support of this conclusion, Parks pointed out that it would not have been sound business practice to enter into the CME Video Tape business without a carefully prepared market analysis *500 and careful forecasts of expected sales volume and selling price. Yet, the offering materials show only a partner's return on equity, assuming no sales, and emphasize the expected tax benefits. Had marketing been a serious business purpose, the offering materials would have shown projections based on the expected or most likely sales forecast. He also found that the marketing efforts for the tapes were weak and that, at the time the partnerships at issue were organized, it was known that sales of earlier CME series were comparatively minimal. Further, the contracts indicate that the tapes were not regarded as valuable. For example, none of them required that the tapes be insured, or that back-up copies be retained. Few protective covenants regarding the use of the tapes were included. The antipiracy features were never fully implemented. Additionally, Parks noted that the notes from the middlemen corporations were secured only by the tapes. Therefore, if the tapes were not producing income, the middlemen corporations could simply "walk away" from their obligation to World Video. Further, there were no covenants in the agreements to prevent the middlemen corporations from actions *501 that would drain their assets prior to the date the note would be due, such as clauses that prohibit the removal of funds from the corporation through dividends or other distributions. Act VI - Scene Four
Feldman
Petitioners' expert, Leonard Feldman (hereinafter Feldman), explained technical differences between video discs and video tapes. One of the major advantages of video discs is that they lend themselves to interactive use by the viewer, that is, the subject matter of the disc can be indexed so that the viewer can "instruct" the video disc machine to proceed to a specific point on the disc. This feature permits the viewer to access instantaneously any spot on the video disc. For example, if a video disc is indexed, the viewer would find it possible to quickly access specific areas of discussion in a visual presentation. By contrast, the primary use of video tape is to show serial events which simply require the viewer to watch the subject matter from beginning to end. A second major difference of video tapes is that the program can be updated, erased, or otherwise changed, whereas updating a video disc would require first making a new video tape. Feldman also explained that *502 video discs are less subject to deterioration than video tapes. However, extreme heat could warp the disc itself. Act VI - Scene Five
Walker
Petitioners' expert, Clifford E. O. Walker (hereinafter Walker), studied the three appraisal reports prepared by McGraw-Hill for the petitioner partnerships. The focus of his study was on the reasonableness of the McGraw-Hill appraisal. After evaluating the appraisal reports, he concluded: (1) that Rodriguez prepared a sound and well documented discussion of the nature of the product and the potential market; (2) that under an aggressive marketing approach peak sales might occur earlier than Rodriguez predicted and decline more rapidly; (3) that the appraisal supports the finding of at least a 10-year life; (4) that the 16-percent discount rate, while low, is in an acceptable range; and (5) that the unit sales price of $ 250 and estimated operating expenses appear to be reasonable. Walker's ultimate conclusion was that the McGraw-Hill appraisals "constitute valid appraisals" prepared in accordance with accepted standards. [8] *503 OPINION Profit Objective - Partnerships
One of respondent's principal arguments is that DIABETICS, ALLERGY and FEMCARE engaged in their CME activities without intending to make a profit. Consequently, he contends that neither the partnership petitioners nor the Charltons as limited partners may deduct their respective share of losses and investment tax credits. Sec. 183. Conversely, petitioners maintain that the partnerships were carrying on bona fide profit-seeking activities and so are not within the purview of section 183. To fall outside section 183, a partnership must show that it engaged in the activity with an "actual and honest objective of making a profit." Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dean v. Commissioner, 83 T.C. 56, 74 (1984); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). "Profit" means economic profit, independent of tax savings. Landrv v. Commissioner, 86 T.C. 1284, 1303 (1986); Beck v. Commissioner, 85 T.C. 557, 570 (1985); Herrick v. Commissioner, 85 T.C. 237, 254 (1985). *504 While the expectation need not be reasonable, there must be a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Lefferl v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-9 (3rd Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 784 (1981). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the *505 financial status of the taxpayer; and (9) whether the elements of personal pleasure or recreation are involved. Whether the requisite profit objective exists is a factual issue to be resolved on the basis of all the evidence in the case. Sutton v. Commissioner, 84 T.C. 210, 221 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Greater weight is given to objective facts than to the taxpayers' mere statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner, 72 T.C. 659 (1979). Partnerships present a special problem in applying section 183. When applying section 183 to a partnership, it is not as simple whose intent we are probing as is the case of an individual, as partnerships are mere formal entities and, obviously, do not have independent minds of their own. Fox v. Commissioner, 80 T.C. at 1007.Generally, our attention focuses primarily upon the general partner's intent, knowledge, conduct, expertise and success in the particular field as well as other factors which he relied *506 upon in making partnership decisions. Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Brannen v. Commissioner, 78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 784-785 (1981).[9] However, we have constructed "partnership intent" by also considering promoters who directly or indirectly established the framework which the general partners followed. See Fox v. Commissioner, 80 T.C. at 1008.In short, we focus our inquiry upon those persons who controlled the partnership. Deegan v. Commissioner, 787 F.2,d 825 at 826 (2nd Cir. 1986), affg. T.C. Memo. 1985-219. Based on this record, it is clear that DIABETICS, ALLERGY and FEMCARE (hereinafter collectively referred to as the partnerships or petitioners, see supra note 3,) lacked the requisite profit objective when they licensed or leased the CME Video Tape programs. Although our conclusion is based on the entire *507 record, the following is a discussion of those factors which we consider to be most important in our decision. Those factors are that: the "fair" market value of the license and leases was grossly overstated, the transactions were not negotiated at arm's length, the marketing efforts made by the partnerships can best be described as "feeble", and the partnerships were not operated in a businesslike manner. Moreover, from the limited partners' point of view, the only material benefits they could realize from their investment were the tax deductions and investment tax credits promised them in the memorandums. Lastly, if we look to which of the cast of characters was intended to (and did) profit from these transactions, the picture is quite clear. The structure created by Hofstein and his advisors pre-ordained that, in the end, the promoters, appraisers, lawyers, sellers of partnership interests, and general partners would be rewarded in cash for their efforts. The limited partners were to receive tax benefits. However, that is the end of the story; let's go back to the plot. Overvaluation of license and leases. We start by evaluating the bona fides of the license and leases into *508 which petitioners entered. They permitted (including extensions) the petitioners to exploit the CME video programs for limited periods of time, at the end of which those programs would be outdated and obsolete, namely, worthless. Therefore, petitioners knew at the outset that in order to produce a profit, they would have to generate enough income, over and above the cost of reproducing, selling, and distributing the tapes, not only to pay the large amounts of money due under the license and lease agreements but to leave enough cash left over to repay the limited partners their investment in the partnerships, plus some profit. The amounts due under the license and lease agreements were formidable. The minimum royalties for DIABETICS were $ 595,000 in cash, and $ 4,505,000 by long-term notes, for a total of $ 5,100,000. These enormous license fees "created" the license fee deductions claimed by the partnership. In addition, ALLERGY and FEMCARE deducted the cash they paid upstream to the middlemen corporations as rental. These minimum rentals for ALLERGY and FEMCARE were $ 645,500 and $ 474,100, respectively. Moreover, these latter partnerships claimed investment tax credits based *509 directly on a "value" of at least $ 800,000 per program, the price at which World Video sold the programs to the middlemen corporations. These investment tax credits were based on a "value" of $ 14,400,000 for the ALLERGY discs, [10] and $ 14,042,604 for the FEMCARE discs. [11]
To forecast payment of these amounts plus a reasonable profit, and to lend credibility to the bases for the investment tax credits, Rodriguez had forecasted total gross sales of $ 48,037,750 for DIABETICS, $ 63,425,000 for ALLERGY, and $ 50,740,000 for FEMCARE, for a total of $ 162,202,750. Yet there is not one iota of evidence to show that the general partners (Klar and Williams) ever sat down with anyone outside of Hofstein's sphere of influence to devise any type of marketing plan to reach such magnitude of sales. Granted, Klar and Williams testified that they had some discussions with Hofstein, Rodriguez, Pietanza, Schaefer, and Macechak prior to assuming their roles a general partners, and we may assume that at least some of these discussions *510 might have concerned sales promotion. However, had a bona fide objective of profit existed, the general partners would have followed sound business practice and had a carefully prepared market analysis and carefully prepared sales forecast made before burdening the partnerships with these huge liabilities. Moreover, had a bona fide profit objective existed, the general partners would have had these studies prepared by independent persons, viz, persons having an interest outside of those persons "selling" the "sales forecasts" computed by Rodriguez and contained in the memorandums. Not only were the sales forecasts ordered and prepared by individuals who lacked independence from the promoters, but they were based upon a number of erroneous assumptions, including that: the physicians producing the series would be internationally recognized authorities, the tapes would be of a high educational caliber, the information would be well presented, a professional sales approach would be taken in marketing the tapes, the tapes would be brought to market rapidly, and the tapes would contain an antipiracy feature to discourage unauthorized duplication. Not one of these assumptions was well *511 founded at the time that the Appraisals were prepared and distributed to the limited partners. With respect to content of the tapes, none of the assumptions were true. While the physicians Hahnemann secured may have been eminently qualified to present their particular lectures, other physicians would have been equally or more qualified. None of the lecturers were shown to have exceptional or international reputations. Further, Mosesson, who was the only appraiser to actually view all of the tapes, found that the tapes "were poorly done from a technical viewpoint." We agree. This Court viewed one tape from each series and found some charts and graphics to be illegible and the subject matter relatively superficially presented. With respect to the assumptions regarding the marketing of the tapes, we also find that none of them were well founded. Total marketing efforts (discussed later in this opinion) were feeble at best. Moreover, when the ALLERGY and FEMCARE series were being appraised, information was available about the sales performance of CME tapes offered for sale by previous CME partnerships. In his report, Rodriguez points out that "previous partnership sales have not *512 done as well as projected (e.g. Ultrasound) and in other cases have been negligible to date." Nevertheless, he continued to use essentially the same assumptions he had used in earlier sales forecasts, resulting in substantially the same numbers, although he knew or should have known that the ALLERGY and FEMCARE tapes would not be marketed vigorously. In asserting that the partnerships possessed the requisite profit objective, petitioners essentially ask us to believe that, when the partnerships licensed or leased their particular series, DIABETICS honestly believed it would realize gross sales of $ 48,037,750, ALLERGY $ 63,425,000, and FEMCARE $ 50,740,000, for a total of $ 162,202,750. These sales forecasts were computed based on a constant price of $ 250 per tape, over a 10-year period, with volume exceeding 10,000 copies per tape. The first element in computing these sales forecasts was a selling price of $ 250. Even if we assume, for purposes of argument, that $ 250 was realistic as an initial sales price, as Parks pointed out, it is a fundamental principle of economics that in a competitive market, the price of goods which can be reproduced tends to gravitate toward the cost *513 of reproducing equivalent or substitute goods. The CME tapes were produced for something more than $ 3,400 each without taking into account overhead costs. Even if we tripled that cost to add in an overhead factor, it would still be approximately $ 10,000. Parks found that substitute series could have been produced by comparable professionals, at a similar cost, from more than one hundred medical centers throughout the United States and brought to market with "very little" time delay. Therefore, it would have been both feasible and extremely profitable for competitors to enter the market at the $ 250 per tape price. Such competition would have caused the selling price to drop precipitously. The second element used by Rodriguez in computing his sales forecasts was that the partnerships could market those video tapes for 10 years. In support thereof, the Appraisal quotes a letter written by Schaefer stating that "the Medical Video Program Library we are producing should be a major contribution to physician continuing study and will be of active interest to the medical profession for the coming decade and even beyond." Yet another letter (also contained in the Appraisal) which Schaefer *514 wrote only 4 days later states that "many concepts concerning * * * diabetic complications [have] changed over the last decade * * *. Therefore, an up-to-date videotape series covering the various aspects of diabetes mellitus will have a widespread appeal to the medical profession." Taking both letters into account, it appears that Rodriguez accepted the fact that concepts concerning diabetics had changed over the past 10 years (to create demand for the tapes), but assumed that such concepts would not change over the next ten (to maintain demand during the 10-year marketing period). In contrast, Krasney found that, under his "most probable case forecast" each series would have a marketable lifetime of 4 years, and under his "best case forecast," he predicted that the series would have a 5-year life. Petitioners contend, however, that foreign sales could supplement declining U.S. sales after the fifth year. We find this argument unpersuasive. First, there is no evidence that foreign doctors are behind U.S. doctors in their quest for up-to-date continuing medical education. Nor is there any evidence that the partnerships seriously intended to market these tapes internationally. The *515 petitioners have failed to prove that the content of the tapes would be of lasting interest and, therefore, could have been expected to be marketed for 10 years. We agree with Parks that the 10-year useful life "almost certainly overstates" the tapes' likely economic life when compared to sales patterns of other information and media products, taking into account the likelihood of competition entering the market and the relatively topical nature of the tapes. The third element used by Rodriguez in computing his sales forecasts was that each series would sell in excess of 10,000 copies. Krasney found that a tape might sell 400 copies during its marketable lifetime, under his most probable case forecast. He found that initial pricing at the $ 200 level, followed by more aggressive pricing, would generate a maximum market penetration in the second year. Mounting competition and a continued market resistance to the video tape medium by physicians would force a price erosion. New advances in medicine could further lower the value of the tapes in the market, he found. Accordingly, he used $ 200 as the selling price for the first year, and dropped that number to $ 125 in year 2, and *516 $ 75 in years 3 and 4. Finally, even with these lower prices he found that 100 tapes could be sold in year 1, 150 tapes in year 2, 100 in year 3, and 50 in year 4. Even under Krasney's best case forecast, he found that only 550 tapes could be sold. While we do not blindly accept either of Krasney's forecasts, it is clear to us that at the time the tapes were produced they could not reasonably have been expected to sell any place close to 10,000 copies each. Rodriguez then proceeds to make a number of technical mistakes in his evaluation of the fairness of the license and leases. He discounts projected cash flows based on potential sales, not on expected sales. Potential sales takes into account only the most optimistic forecasts, and fails to take into account that sales could reasonably be expected to take a number of values over some range. Additionally, he chose a 16-percent discount rate rather arbitrarily, notwithstanding that he first presented a discussion of risk and return and the Capital Asset Pricing Model. He admitted this at trial, although from reading the Appraisals, one is led to assume that he had used the methodology discussed. For these and numerous other factors *517 brought out at trial, we conclude that the value of the license and leases was grossly overstated by Rodriguez. These overvaluations, coupled with the sales from World Video to the middlemen corporations, set the stage for the partnerships' claiming exaggerated deductions for license fees and lease rentals and exorbitant investment tax credits. The lack of arm's length transactions. In our evaluation of petitioners' true objective in these transactions, we also took into account the fact that the transactions were not the result of arm's-length dealings. No one disputes that the transactions between World Video and the middlemen corporations were not at arm's length; the private placement memorandums admit as much. However, the transactions between the middlemen corporations and the partnerships also were not at arm's length because, among other factors, Hofstein selected and controlled the general partners. Although Hofstein testified that Klar and Pietanza negotiated bitterly at times, there is no evidence as to the nature of those negotiations or that they were undertaken to secure any benefit on behalf of the partnerships themselves or the limited partners. Moreover, there is *518 little evidence that the general partners seriously questioned the Appraisals or Market Studies. Clearly, they did not seek out independent opinions despite the large amounts involved. Nominal marketing efforts. Most importantly, a close look at what the partnerships actually did shows that they never intended to market the tapes vigorously. DIABETICS and FEMCARE had no funds allocated to marketing efforts in their private placement memorandums and, at most, ALLERGY allocated only $ 19,600 to marketing. Moreover, DIABETICS allocated only $ 45,000 to working capital out of a total of $ 1,470,000 in funds it intended to raise. ALLERGY allocated only $ 80,400 to working capital out of $ 980,000 it intended to raise, and FEMCARE only $ 40,000 in working capital out of $ 686,000. Although petitioners produced no evidence that they intended to employ this working capital in any type of marketing effort, even if we assume they would do so, these limited funds would not have sustained, much less begun, the marketing efforts necessary to produce the $ 162,202,750 in sales forecasted by those memorandums. When we compare the available working capital to the astronomical sales forecasts, *519 we are convinced that the partnerships did not intend to market their tapes with an aim toward realizing a profit. Moreover, those marketing efforts which were actually attempted were belated. DIABETICS licensed tapes as of December 31, 1981, yet did not contract out its marketing efforts until June 10, 1983. ALLERGY leased discs on December 27, 1982, but similarly started no real marketing effort until it signed a distribution agreement with Marketing on June 10, 1983. FEMCARE leased discs on June 16, 1983, but did not execute a distribution agreement with Marketing until August 29, 1984, at the earliest. These delays were significant because the CME programs were wasting assets; with each day that past, they lost value. In addition, it is obvious that Marketing failed to obtain results. From 1983 to 1985 inclusive, Marketing received $ 5,828 from sales and rentals of the DIABETICS series, $ 15,769.45 from exploiting the ALLERGY series, and $ 5,116.30 from the FEMCARE series, of which it paid DIABETICS no more than $ 1,458, ALLERGY no more than $ 9,316.88, and FEMCARE no more than $ 1,285.80. Finally, we find it important that, although the partnerships knew that sales were not *520 proceeding well, they did not employ a new marketing company or otherwise endeavor (except for CME Tours discussed below) to exploit the programs. [12] Such a failure on the part of the partnerships to arrange quickly and vigorously for the reproduction, sale, and distribution of the tapes evidences their lack of a profit objective. Petitioners claim that a minimum of $ 770,000 was devoted to the marketing effort. They reach that figure by totalling Klar's investment in CME Tours of approximately $ 250,000, Hofstein's loan to Marketing of approximately the same amount, working capital of the three partnerships, and working capital in Klar's and Williams' other partnerships. We completely reject petitioners' argument on this point. These figures include funds devoted to efforts for partnerships other than those which are the petitioners in this case. What other partnerships contributed to Marketing's efforts or what sales they expected from Marketing is clearly irrelevant to this case. In addition, although CME Tours may *521 have had a profit objective, the bulk of those profits were designed to go to Klar, not to the partnerships. Unbusinesslike partnership operations. In analyzing whether the partnerships operated in a businesslike manner, we first recognize that their activities were of a relatively passive nature. They contracted out their most vital activities and functions to Marketing: reproducing, promoting, selling, and distributing the CME programs. The only "activities" that the partnerships actually carried out were confined to contracting with various entities to acquire certain rights and to perform certain tasks. Even so, we find that the partnerships did not delegate these vital functions or perform the remaining tasks in a businesslike manner, particularly in light of the purported value of the assets involved, the purported magnitude of the liabilities incurred, and the purported tax benefits conferred. We think a few examples will illustrate this point succinctly. With regard to the assets, we note that neither the license nor lease agreements grant the partnerships the unfettered right to inspect and/or reject a particular tape or disc. Since at the time they were licensed or leased, *522 not all of the tapes and discs had been delivered, the partnerships agreed to accept these assets "sight unseen." Moreover, in actual practice, the programs were picked up by Hofstein, Macechak, or a messenger service directly from Hahnemann's television studio. There is no evidence that Klar or Williams even viewed the programs upon delivery, notwithstanding that exceptional quality was essential to their purported value. Moreover, the license and lease agreements did require that, unless waived by the middlemen corporations, the partnerships were to have an antipiracy feature installed on all reproductions. Marketing installed an antipiracy feature onto some of the reproductions for a 3-month period beginning in the fall of 1982. After the machine which added this feature broke down, however, Marketing discontinued placing the device on any of the reproductions. Had the partnerships intended to protect the value of their programs, they would have insisted that the antipiracy feature be added. Further, the license or lease agreements did not require either party to insure the programs or retain backup copies to guard against their loss from possible theft or damage. Nor is there *523 any evidence that any entity involved in this case actually insured them. Certainly, the partnerships did not. Had the programs been worth $ 800,000 each, prudent business practice would have dictated they be insured. We also note that Klar stored the ALLERGY discs in a storage facility which was not air-conditioned. Temperatures in Phoenix, Arizona, can reach 115 degrees in the summer. Despite the fact that the jacket on the discs warned that they should be stored under "cool" conditions, Klar made no attempt to protect the discs from potential damage. Evidence of unbusinesslike practices with regard to the liabilities incurred by the partnerships also was present. For instance, in connection with the license and leases, we are left with some confusion as to which programs ALLERGY actually leased. The ALLERGY lease agreement lists 21 titles (there are two different number 9's). However, 4 of the titles are repeated, so it is possible that only 17 programs were leased. DIABETICS paid $ 276,962 to "World MedicalLicensing Corp." by check, presumably for a license fee. However, that entity does not even exist. The check was endorsed over to Licensing by World Video. In addition, *524 Williams did not even execute the documents necessary for FEMCARE to lease the FEMCARE series from Trans Oceanic. Nor did he sign the amendment to the lease agreement. Rather, an attorney in Savage's firm signed the agreements under Williams' power of attorney. With regard to the purported tax benefits conferred, unbusinesslike conduct included, for example, the fact that ALLERGY reported "qualified investment in new recovery property" of $ 8,000,000, on its 198 2 income tax return, and qualified investment in new recovery property of $ 6,400,000 on its 1983 income tax return. Yet the investment credit passthrough document signed by Pietanza and Klar states that possession of all of the discs was transferred to ALLERGY on December 30, 1982. To add to the confusion, invoices in evidence show that the first ALLERGY discs were not even shipped by Pioneer Corporation to World Video until January 1983. Pioneer Corporation shipped the remaining ALLERGY discs to World Video by June 1983. Moreover, a comparison of the titles shown on the ALLERGY lease to those shown on the investment tax credit passthrough document shows that 17 of the titles are the same. However, there are 20 titles *525 listed on the passthrough document. Two of the topics are duplicated. The eighteenth was written in by hand on the passthrough document but does not appear on the lease. Tax benefits. From the limited partners' point of view, the only material benefits they could realize from their investment were the tax deductions and investment tax credits promised them in the memorandums. We are convinced that the limited partners purchased their units for the overriding purpose of securing the enormous tax benefits promised to them. Promised tax benefits which are suspiciously excessive require close scrutiny. See Flowers v. Commissioner, 80 T.C. 914, 941 (1983).A couple of points will illustrate the reason for this conclusion. First, the memorandums emphasize tax benefits. A limited partner in DIABETICS was promised a 3.9 to 1 equivalent writeoff in 1981, an equivalent writeoff of 4.3 to 1 in 1982, and an equivalent writeoff of 5.9 to 1 in 1983. For ALLERGY, these numbers were 3.8 to 1 for 1982, and 3.3 to 1 for 1983. For FEMCARE, these numbers were 3.7 to 1 for 1983, and 3.8 to 1 for 1984. The investment tax credit passthrough for ALLERGY amounted to $ 800,000 for 1982, and $ 640,000 *526 for 1983, and for FEMCARE amounted to $ 702,130 for 1983, and $ 702,130 for 1984. These numbers, in effect, told a prospective limited partner that he would more than recoup his cash investment regardless of the partnership's success or failure. Moreover, the limited partners were required to certify that they had substantial income or capital from sources other than the CME Video Tape programs before they were allowed to purchase their unit(s). From this, we may infer that, as a whole, they were in relatively high tax brackets. Consequently, they could "profitably" use the losses and investment tax credits at issue. In summary, the whole scheme, particularly the magnitude of the numbers involved, convinces us that the limited partners purchased their units for the purpose of securing tax benefits. Promoters profited - not partnerships. Lastly, if we look to which of the cast of characters intended to (and did) profit from these transactions, the picture is quite clear. We first note that petitioners argue on brief that Klar had a profit objective in forming and operating CME Tours and that such objective should be attributable to the partnerships for which he served as general *527 partner. Moreover, at trial, Williams stated that he was looking forward to the formation of more partnerships because they were profitable. We emphasize here that we are not finding that Klar and Williams did not intend to profit personally. It is clear that not only did they receive substantial commissions on the selling of the units, but they also received a fee as general partners. In addition, Klar may very well have intended to profit from CME Tours. However, we are here concerned with the profit objective of the partnerships. In considering this record, we find that the real motivations among this cast of characters can really be discerned by tracing the flow of cash anticipated to be raised as set forth in the private placement memorandums. Although the record is not complete as to every detail of the actual amount of cash raised and disbursed, based on the private placement memorandums, the following amounts substantially reflect what actually happened. Of the $ 3,136,000 raised by the petitioners ($ 1,470,000 by DIABETICS, $ 980,000 by ALLERGY, and $ 686,000 by FEMCARE), $ 1,819,600 went to corporations controlled by Hofstein, $ 42,000 to Rodriguez, $ 75,000 to tax counsel, *528 $ 421,400 to the sellers of the partnership interests, and $ 110,000 to the general partners, leaving only $ 434,500 to go to the DIABETICS' investment account (which amount the record fails to account for), and $ 233,500 for organization costs and working capital. That the aforementioned persons and entities profited is not in question. They did profit and profited handsomely. However, their objective of profit cannot be attributed to the petitioner partnerships. Quite the contrary, to the extent these persons were compensated from the offering proceeds, the amounts available to partnerships from the offering proceeds were correspondingly reduced, thereby also reducing the capability of the partnerships to adequately promote sale of the tapes. Economic Substance
Petitioners also argue that the partnerships had economic substance beyond tax considerations. In support thereof, they rely on the Appraisal and the Market Studies to determine that a $ 250 sales price was a possibility; a 5.02-percent market penetration of the primary care physician target audience over a 10-year period was reasonable, and that the estimated costs involved in reproducing and selling the tapes were reasonable. *529 In support thereof, petitioners submitted the following computation per tape: Gross sales: 126,737 X 5.02% (or 6,362) X $ 250 = 1,590,500 Costs:
tapes:
6,362 X $ 30
190,860
administrative:
21% of sales
334,005
license fee:
35% of sales
556,675
Net revenue over 10 years:
508,960
What petitioners' analysis fails to point out, however, is that, to achieve such forecasts, 5 percent of the primary target audience of physicians must purchase all 17 programs in the DIABETICS series, all 20 programs in the ALLERGY series, and all 16 programs in the FEMCARE series over a 10-year period. In other words, every primary care physician in the United States would have to purchase an average of three CME video tapes at $ 250 per tape during the 10-year period. Moreover, when we consider that there were some 27 CME series all competing for the primary care physicians' dollar and that each series contained approximately 15 programs (400 programs with 27 partnerships), we would have to believe that the 27 partnerships could reasonably expect to sell 2,576,610 tapes (6,362 tapes X 27 partnerships X 15 programs) in 10-years. In other words, we would have to believe that the 27 partnerships could sell to 126,737 *530 primary care physicians, an average of 20.34 programs each, at a cost of $ 5,085 per physician. At best, we call this projection unrealistic. Even if we were to accept petitioners' argument that physicians and allied health care personnel, other than primary care physicians, would purchase tapes, we nevertheless find their projections unreasonable. We could set forth numerous other examples for our finding that each partnership lacked the requisite profit objective, but we find such effort needless in light of the glaring nature of the examples we have highlighted thus far. After considering all of the facts, the law, and each of petitioners' arguments, we are convinced each partnership engaged in its activities knowing that they were destined to produce economic losses and tax benefits. The inflated Appraisals and sales between related entities, coupled with large long-term notes (in the case of DIABETICS) were used to create enormous bases to support gigantic license and lease deductions and investment tax credit passthroughs. Although the record is not complete as to every last detail, it is clear that substantially all of the cash raised by the partnerships was paid to the *531 entities controlled by Hofstein, to those who sold limited partnership units, and to the general partners. The excessive license and lease deductions and investment tax credits made the transactions with the partnerships feasible. It is abundantly clear that DIABETICS, ALLERGY and FEMCARE were not formed with the requisite profit objective, but with the objective of providing tax benefits for the limited partners. Consequently, we hold that respondent properly made the adjustments set forth on the FPAA's with respect to the losses each partnership claimed for the years reflected in the FPAA's. In addition, we hold that, with respect to Charlton's investment in DIABETICS, respondent properly disallowed the losses claimed for each year at issue. Investment Tax Credits
It is clear that no investment tax credit is allowable for property used in an activity not engaged in for profit. See secs. 48(a), 167, 168, 183(c). Because we have held that the petitioners lacked a profit objective, we also sustain respondent's adjustments in the FPAA's and his determination with respect to the investment tax credits claimed by the Charltons to the extent that their investment is attributable to *532 DIABETICS. Hagler v. Commissioner, 86 T.C. 598, 621-622 (1986), affd. without published opinion sub nom. Dahlmeier v. Commissioner, 822 F.2d 63 (11th Cir. 1987). Additions To Tax
Negligence
Respondent determined that the Charltons were negligent in claiming their distributive share of DIABETICS losses and investment credit. Accordingly, he determined that they were liable for the additions to tax under section 6653(a) (for 1979) and sections 6653(a)(1) and (2) (for 1981 and 1982). Section 6653(a) (for 1979) and section 6653(a)(1) (for 1981 and 1982) provide that if any portion of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, an amount equal to 5 percent of the underpayment is added to the tax. Section 6653(a)(2) (for 1981 and 1982) provides for an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence has been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1984); Neely v. Commissioner, 85 T.C. 934, 947 (1985). *533 Because an addition to tax under section 6653(a) is presumptively correct, the taxpayer bears the burden of establishing that respondent's determination was erroneous. Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Enoch v. Commissioner , 57 T.C. 781 (1972). Mr. Charlton testified that he relied on the advice and reputation of Klar and the information in the DIABETICS memorandum to determine whether to invest in DIABETICS. Except for those contained in the Rodriguez appraisal, the DIABETICS memorandum does not contain any financial projections containing estimated sales, expenses, or net income. Nor does it advise the limited partners when they may expect to receive cash distributions or if such distributions could be expected to exceed their investment. However, the DIABETICS memorandum did advise the limited partners that they would receive up to a 5.9 to 1 tax writeoff even if no tapes were sold. The Charltons paid $ 28,873 for two-thirds of one unit in DIABETICS, yet during the years in issue deducted a total of $ 78,174 in losses. Based on Mr. Charlton's business experience and the many investments shown on petitioners' *534 income tax returns for the years in issue, he must have realized that the promised tax benefits as compared with his cash investment were just too good to be true. Yet he continued to rely only on the memorandum coupled with Klar's reputation. He was negligent in doing so. See Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. Nevertheless, the Charltons argue that they were not negligent in relying on Klar's advice because a previous investment with Klar had been profitable, and they were pleased with him. We do not believe that prior profitable dealings with a promoter absolve the petitioners from investigating the propriety of tax losses claimed with respect to a subsequent investment. Mr. Charlton also consulted with his accountant and had lunch with an attorney to discuss the DIABETICS memorandum. However, he failed to disclose the substance of those conversations or the advice he received. Good faith reliance on a competent accountant's or attorney's advice may insulate a taxpayer from the section 6653(a) addition to tax. Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989). *535 Not having any evidence of what the accountant and the lawyer told Mr. Charlton, however, precludes us from such a determination. Mr. Charlton also asked his personal physician whether he would use video tapes for continuing education. According to Mr. Charlton's testimony, his response was "somewhat noncommittal." This comment certainly is no basis on which we may conclude that the Charltons acted prudently. The Charltons also contend that their reliance on the Appraisal and Market Survey contained in the memorandum absolves them of the addition to tax for negligence, citing Sammons v. Commissioner, 838 F.2d 330 (9th Cir. 1988), affg. in part and revd. in part a Memorandum Opinion of this Court; and Biagiotti v. Commissioner, T.C. Memo. 1986-460, in support thereof. In Sammons, the Ninth Circuit held that "when a taxpayer exercises due care in obtaining an appraisal of fair market value * * * and the taxpayer presents 'some proof' in support of the asserted fair market value, reasonable reliance on a valuation report does not amount to negligence." 838 F.2d at 337. Similarly, in Biagiotti, this Court held that the negligence penalty was inappropriate because the taxpayers had no *536 reason to question their expert's ability or reliability. In both cases, the courts focused on whether reliance on the appraisal was reasonable. We think this case is clearly distinguishable. The valuation of the tapes and license fees payable thereon as shown in the DIABETICS memorandum clearly was extraordinarily high, especially when taking into account the fact that the Appraisal was based on the supposed earning power of the asset valued, yet the memorandum failed to estimate even one dollar of income in its projection of tax benefits. Moreover, the Charltons knew that the Appraisal was not prepared by an independent party but under the auspices of the promoters, who were to directly benefit therefrom. They must have surmised that the sale of the partnership units depended upon the tax benefits promised, and the amount of these benefits indirectly rested on the magnitude of the appraised value, viz, the higher appraisal justified higher licensing fees. Yet, without an investigation of any substance, the Charltons accepted those values. This is not the bona fide reliance that was present both in Sammons and Biagiotti. For the foregoing reasons, we find that the Charltons *537 were negligent in deducting their DIABETICS losses and claiming the related investment tax credit. Accordingly, we hold that they are liable for the addition to tax pursuant to section 6653(a) for 1979 and section 6653(a)(1) and (2) for 1981 and 1982. Substantial Understatement
In an amended answer, respondent alleged that, for 1982, the Charltons are liable for $ 1,521.50 as an addition to tax pursuant to section 6661. Because respondent has raised this issue as a new matter, he bears the burden of proof. Rule 142(a); Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981). Section 6661 provides that a taxpayer whose income tax return contains a substantial understatement of tax may be liable for an addition to tax equal to 25 percent of the underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). This section applies to income tax returns that are due to be filed after December 31, 1982, but only if the addition to tax will be assessed after October 21, 1986. Because the Charltons filed their 1982 income tax return on or about August 15, 1983, and any assessment will be made after this Court renders its decision, they come within those parameters. *538 The term "understatement" is expressly defined by section 6661(b)(2) as the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return. Further, the term "substantial understatement" is defined in section 6661(b)(1) as an "understatement" which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. If a "substantial understatement" is present, it triggers the application of the addition to tax provided for in section 6661(a). Woods v. Commissioner, 91 T.C. 88, 95 (1988). The Charltons understated their income tax by $ 6,086 for 1982 by claiming a loss from DIABETICS. This amount is more than 10-percent of the tax required to be shown on their return, and more than $ 5,000. Clearly, the Charltons' understatement of tax for 1982 is a "substantial understatement." One of the ways an amount of understatement can be reduced, however, is by showing that there is substantial authority for the tax treatment of the item at issue. Sec. 6661(b)(2)(B)(i). In the case of "tax shelters," however, the reduction for substantial authority applies only where the taxpayer reasonably believed *539 that the tax treatment was more likely than not the proper treatment. Sec. 6661(b)(2)(C). A partnership whose principal purpose is the avoidance or evasion of Federal income tax is considered a tax shelter for section 6661 purposes. Sec. 1.6661-5(b)(1), Income Tax Regs. Because we have already found that the principal purpose of DIABETICS was to provide income tax benefits to the limited partners, DIABETICS is considered a "tax shelter" for application of section 6661. The Charltons argue that they relied in good faith on the opinion of tax counsel included in the DIABETICS memorandum, and, therefore, they reasonably believed that their tax treatment of the partnership's reported losses and investment credit was more likely than not proper. We have examined the tax opinion and find that it is replete with cautions and waivers. Based on the language contained in the tax opinion, the Charltons could not have believed that they would have more than a 50-percent chance of prevailing in the event of litigation. Finally, the Charltons argue that section 6661(c) provides that the addition to tax can be waived if there was reasonable cause for the understatement, and the understatement *540 was made in good faith. Sec. 6661(c). However, that section gives such authority to the respondent, not the Court. We have no power to require such a waiver, only to review the respondent's refusal to do so. Mailman v. Commissioner, 91 T.C. 1079 (1988).The standard under this review is whether respondent abused his discretion. There simply is no evidence in this record that he did so. Accordingly, we hold that, for 1982, the Charltons are liable for the addition to tax pursuant to section 6661. Additional Interest
Respondent also determined that the Charltons were subject to the increased rate of interest provided in section 6621(c) (formerly section 6621(d)) for 1979, 1981, and 1982. Section 6621(c) provides for an interest rate of 120-percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" which is "attributable to one or more tax-motivated transactions." Stanley Works and Subsidiaries v. Commissioner, 87 T.C. 389, 413-415 (1986). An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to *541 the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). The phrase "tax motivated transactions" includes sham transactions entered into primarily for tax benefits. Sec. 6621(c)(3)(A)(V). Also included are deductions disallowed under section 183, relating to activities or transactions not engaged in for profit. Sec. 301.6621-2T, A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). We have found that the DIABETICS transactions were not engaged in for profit and were lacking in economic substance, and that petitioners invested their money in DIABETICS primarily for the tax benefits promised in the memorandum. Therefore, all of DIABETICS' losses were attributable to "tax-motivated transactions." Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion *542 sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Accordingly, we hold that the Charltons are liable for the additional interest under section 6621(c). CURTAIN Because of respondent's concessions, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Diabetics CME Group, Ltd., Jules H. Klar, Tax Matters Partner, docket No. 19295-87; Allergy CME Group, Ltd., Jules H. Klar, Tax Matters Partner, docket No. 19297-87; and Femcare CME Group, Ltd., Virgil Williams, Tax Matters Partner, docket No. 21098-87.↩
2. All section references are to the Internal Revenue Code, as amended and in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Under the Court's Rules the "petitioner" in a TEFRA partnership action is the tax matters partner, a notice partner, or a representative of a 5-percent group. However, for the sake of convenience, and in order to distinguish Diabetics, Allergy, and Femcare from certain other partnerships, we will frequently refer to Diabetics, Allergy, and Femcare in this Opinion as the "petitioners" or as the "petitioner partnerships." See Rules 240(c)(1)(B), 240(c)(2)(B), 241 and 245.↩
*. Sec. 6653(a) for 1979.↩
**. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence under section 6653(a)(2).↩
4. ACCME was founded to succeed the American Medical Association Committee for the Accreditation of Continuing Medical Education and the Liaison Committee on Continuing Medical Education.↩
5. Prior thereto, World Video and Hahnemann had reached other agreements.↩
*. Does not include assumption of recourse liability of the Partnership due in April 1991 (or, depending on certain Partnership elections, April 2001).↩
6. These cash flow provisions are included in the Limited Partnership Agreement attached to the private placement memorandum, but are not in the executed Limited Partnership Agreement.
7. This item was listed on the return, but not included in total deductions.↩
8. Back on February 20, 1981, Walker had appraised a CME Video Tape series entitled "Hypertension" and found that the series was worth $ 865,000 per tape. Walker's report on the Hypertension tapes reads much like McGraw-Hill's of the petitioner partnership tapes.
9. Little significance is given to the limited partners' intent since they have no control over the partnership activities or business deductions. Landry v. Commissioner, 86 T.C. 1284, 1303 (1986); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695↩ (11th Cir. 1984).
10. We note that CME Productions "paid" World Video $ 16,000,000 for the ALLERGY discs. ↩
11. We note that Trans Oceanic "paid" Video Tech $ 12,800,000 for the FEMCARE discs.↩
12. There are a few distribution agreements in evidence with firms other than Marketing, but the record is unclear as to whether or to the extent they took effect.↩